# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

IN RE: SUFFOLK UNIVERSITY COVID    )
REFUND LITIGATION                              )
                                                              )
THIS DOCUMENT RELATES TO:          )          Master File No.: 1:20-cv-10985-WGY
ALL ACTIONS                                       )
_____)

# EXPERT REPORT OF

# BENJAMIN S. WILNER, Ph.D.

# __Table of Contents__

I.      *Introduction* _____ *1*

II.     *Qualifications* _____ *2*

III.    *Case Background* _____ *3*

    A. Tuition & Fees  _____ 5

    B. The Plaintiffs' Proposed Damages Methodology _____ 7

IV.     *Summary of Opinions* _____ *8*

V.      *Actual Data Contradict the Plaintiffs' Proposed Damages Theories and Are Consistent with Putative Class Members Not Being Damaged* _____ *8*

    A. Putative Class Members in Virtually All of Suffolk's Degree-Granting Programs During the Spring 2020 Semester Faced the Same List Price for Online and In-Person Classes_ 9

    B. Putative Class Members Had Paid the Same or Less for In-Person Classes As Compared To The Remote Classes During the Spring 2020 Semester _____ 9

    C. Putative Class Members Paid Higher Prices for Semesters They Knew Would Be Impacted By COVID-19 _____ 11

VI.     *The Plaintiffs Have Not Identified The Alleged Putative Class Members Nor Their Alleged Per Capita Loss* _____ *12*

VII.    *The Plaintiffs' Proposed Per Capita Prorated Benchmark Tuition Damages Theory Is Fatally Flawed* _____ *13*

    A. The Plaintiffs' Benchmark Methodology Is Fatally Flawed_____ 14

    B. The Plaintiff's Prorated Methodology Is Fatally Flawed _____ 23

VIII.   *The Plaintiffs' Proposed Per Capita Prorated Benchmark Fee Damages Theory Is Fatally Flawed* _____ *26*

    A. Contemporaneous Data Show That Putative Class Members Received Value from the Remote Portion of the Spring 2020 Semester_____ 26

    B. Even If There Were Some Diminishment in Value During the Time Suffolk Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized _____ 29

    C. The Number of Days Cannot Be Utilized to Calculate Prorated Damages _____ 31

IX.   *Even if Mss. Foti & Durbeck Were Able to Demonstrate that Suffolk's Spring 2020 Semester Was Less Valuable in Some Way, Putative Class Members Were Not Necessarily Damaged* _____ *32*

   A.   Students Receiving Financial Aid Might Not Be Damaged _____ 32

   B.   Students Who Did Not Pay Their Own Tuition Would Not Be Damaged, Which Further Creates Individualized Issues _____ 34

   C.   Past Refunds Would Offset Any Alleged Damages _____ 35

   D.   The Named Plaintiffs, Mss. Foti and Durbeck, Were Not Damaged Because They Received Financial Aid_____ 35

X.    *Mss. Foti and Durbeck's Damages Theory Does Not Demonstrate That Suffolk Was Unjustly Enriched* _____ *37*

XI.   *Conclusion* _____ *38*

# I.    Introduction

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, Suffolk University ("Suffolk"), to comment on the alleged damages in the aforementioned matter.  In particular, I, Benjamin S. Wilner Ph.D., have been asked to respond to the claims of Ms. Anna Foti and Ms. Julia Durbeck that all Suffolk students enrolled in in-person classes who paid any tuition and/or fees for the Spring 2020 Semester were economically damaged by Suffolk's transition to remote classes in the Spring 2020 Semester and that damages can be formulaically determined on a class-wide basis.

As discussed below, I conclude that Mss. Foti and Durbeck's proposed damages methodology is flawed for multiple reasons.

- It ignores the fact that, for the vast majority of Suffolk's degree-granting programs, including the undergraduate program in which both Mss. Foti and Durbeck were enrolled, Suffolk charges the same List Price for in-person and online courses.
- It assumes that students would demand to pay less, and Suffolk would charge less for the classes taken / offered during the remote portion of the Spring 2020 Semester even though students / Suffolk actually exhibited contradictory behavior by paying / charging full prices when confronted with a similar situation.
- Even if one assumes that students were damaged, such damages would vary with the different programs Suffolk offered, and damages relating to tuition are distinct from damages relating to fees.  At best, Mss. Foti and Durbeck's proposed damages methodology assesses alleged per capita losses for putative class members in one program (students pursuing an MBA degree) for tuition, but not fees.  Mss. Foti and Durbeck did not identify alleged per capita losses for putative members in other programs Suffolk offered.  Consequently, the proposed damages methodology is inapplicable to the two Named Plaintiffs, who were enrolled in Suffolk's full-time undergraduate program.  Additionally, the Plaintiffs have not quantified the number of putative class members in each program.
- The Plaintiffs' proposed damages methodology is further flawed because it assumes that Suffolk's online MBA program provides a benchmark for what tuition should have been.  This assumption incorrectly assumes that all students would view the Suffolk online MBA program as a comparable education environment, which is untrue as, for example, Mss. Foti and Durbeck would not even be eligible for online MBA classes.
- Mss. Foti and Durbeck ignored the value students received from the classes they took and the services Suffolk provided when remote classes were offered.
- Even if Mss. Foti and Durbeck were able to demonstrate that Suffolk's Spring 2020 Semester was less valuable in some way, putative class members would not necessarily have been damaged as a result.

I generated these conclusions by reviewing the documents listed in ***Exhibit 1***.  I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M is compensated at a rate of $745 per hour for my time. Other individuals from A&M also provided assistance in this matter; their hourly rates range from $250 to $745.[1]

## II.  Qualifications

My curriculum vitae (***Exhibit 2***) details my credentials, testimony, publications and awards.

I am a Managing Director at A&M. I have served as an expert witness and business consultant performing economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, and a wide range of class action, intellectual property, insurance claim, lost profits and lost income matters. I also received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff.

I hold a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course degree in Mathematics & Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University. MEDS studies how consumers, governments and businesses make decisions in a wide variety of economic and other environments.

I served as a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal on the subject of finance. I have been awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited in over 800 papers.[2] I also have served as a referee for multiple academic journals and textbooks.

This research studied the impact of decision making on real-world economic situations. For my NSF grant, my coauthors and I statistically analyzed data on consumer buying behavior for products that could be sold in bundles. My undergraduate thesis was performed under Colin Camerer, a MacArthur Genius Award winner, who utilizes experimental economics to study psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the University of Chicago relied on that thesis as the theoretical basis for one of his published research papers on negotiations. My *Journal of Finance* paper analyzed bank and supplier decision making in bankruptcy.

As an undergraduate student, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic

---

[1] No one who has contributed to this engagement has any known financial interest in any party to the matter. A&M's compensation is neither based nor contingent on the results of this analysis. This Report is provided solely for use in the matter described in the caption at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document other than an order of the Court in this matter without the express written consent of A&M.

[2] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on December 23, 2021.

and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for analyzing environments that cause respondents to truthfully and accurately reveal their full preferences, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

# III. Case Background

COVID-19 forced universities throughout the country to transition to a remote teaching and learning environment, especially during the Spring of 2020. Suffolk was no exception.

Suffolk's Spring 2020 Semester began on January 13th and lasted until early May, with final exams occurring during the last week.[3]

On March 10, 2020, the Commonwealth of Massachusetts declared a state of emergency in response to COVID-19.[4] Suffolk students were on Spring Break at that time.[5] Suffolk notified students on March 11th that Spring Break would be extended by two days; classes would resume on Wednesday, March 18, 2020 and continue via remote instruction for the remainder of the semester.[6]

In further response to the pandemic and government directives, Suffolk asked students who could safely leave campus to do so, and subsequently refunded $4.0 million in room and board, $0.7 million in meal plans, and over $250,000 in fees related to travel.[7] In addition to these refunds, Suffolk provided CARES / COVID-19-related grants to students upon request to assist with financial needs arising because of COVID-19 and the transition to remote classes.[8]

Not only did Suffolk lose revenue from these refunds, but, as discussed below, Suffolk lost other revenue and incurred additional costs because of COVID-19 and its transition to remote classes. For example, Suffolk incurred additional costs to ensure "all students had online access by providing loaner laptops, hot spots, and other technology options to students who did not have computers or who had poor internet access or other difficulties connecting to Suffolk's remote system. Further, key library resources were available remotely."[9]

---

[3] https://www.suffolk.edu/academics/current-student-resources/academic-calendar/college-of-arts-and-sciences-and-sawyer-business-school viewed on April 14, 2022.

[4] https://www.mass.gov/news/governor-baker-declares-state-of-emergency-to-support-commonwealths-response-to-coronavirus viewed on April 4, 2022.

[5] https://www.suffolk.edu/academics/current-student-resources/academic-calendar/college-of-arts-and-sciences-and-sawyer-business-school viewed on April 14, 2022.

[6] Statement of Undisputed Material Facts in Support of Defendant Suffolk University's Motion for Summary Judgement, 20-110985-WGY, Dkt. 121, paragraph 4.

[7] Defendant Suffolk University Amended Second Supplemental Responses to Plaintiffs' First Set of Interrogatories, 2022.02.25, Response to Interrogatory No. 6.

[8] https://www.suffolk.edu/-/media/suffolk/documents/student-financial-services/types-of-financial-aid/cares-act/heer and finstshare102620-2_v2.pdf?la=en&hash=C75B0733F137E015C5B344C1C688BF34F2125739 viewed on April 18, 2022.

[9] 2022.03.21 Affidavit of Ann Coyne in Support of Defendant Suffolk University's Motion for Summary Judgment, 20-110985-WGY, Dkt 121-1, paragraph 5. All further affidavits in support of Suffolk's Motion for Summary Judgment are hereafter referenced by name and docket cite. Unless otherwise indicated, all docket cites refer to 20-110985-WGY.

The effects of COVID-19 continued into subsequent semesters. For example, the Fall 2020 Semester was offered with a combination of face-to-face and remote classes, with most face-to-face classes being offered in a hybrid modality.[10] Suffolk also continued to experience revenue losses from, amongst other things, receiving less in room and board payments.[11]

Ms. Foti was a Junior at Suffolk during the Spring 2020 Semester pursuing a Bachelor's degree in sociology with a minor in psychology.[12] Ms. Foti took 16 credit hours during the Spring 2020 Semester.[13] These classes all commenced in-person. Ms. Foti continued taking these classes, earning credits towards her degree, after the transition to remote instruction in March 2020.[14] Not only did Ms. Foti take remote classes during the second part of the Spring 2020 Semester, but she voluntarily elected to enroll in remote classes at Suffolk during the Fall 2020 Semester.[15] Utilizing the credits she earned from in-person, remote and hybrid classes, Ms. Foti graduated in May 2021.[16] The academic credits Ms. Foti obtained from these classes were sufficient for her to be accepted to Suffolk's Master's in Crime & Justice Studies Program, which began in the Fall 2021 Semester.[17] Ms. Foti achieved a 3.50 GPA in this Master's program during the Fall 2021 Semester.[18]

Ms. Durbeck was a Senior during the Spring 2020 Semester pursuing a Bachelor's degree in biology and chemistry.[19] Ms. Durbeck took 12 credit hours during the Spring 2020 Semester.[20] All but one of her Spring 2020 Semester classes commenced in-person; prior to the pandemic, she elected to take one online course during the Spring 2020 Semester.[21] Ms. Durbeck continued taking these classes, earning credits towards her degree, after the transition to remote classes in March 2020.[22] Utilizing these credits, Ms. Durbeck graduated in May 2020.[23] Her education was sufficient to allow her to become an Emergency Medical Technician at Lawrence General Hospital and later a Research Associate at Ultragenyx Pharmaceutical Inc.[24]

Mss. Foti and Durbeck filed this lawsuit seeking to certify a class of "All students enrolled in an in-person/on-campus based program or classes at Suffolk University ("Suffolk"), and not any separate Suffolk online programs only, before March 11, 2020, who paid Suffolk any of the

---

[10] https://thesuffolkjournal.com/29603/news/suffolk-announces-big-changes-to-how-classes-housing-will-look-inthe-fall/ viewed on April 18, 2022.

[11] 2022.03.21 Affidavit of Laura C. Sander, Dkt. 121-1, paragraph 3.

[12] First Amended Class Action Complaint and Demand for Jury Trial of Anna Foti ("Foti Complaint"), 20-11581-WGY, Dkt. 6, paragraph 10.

[13] Academic Transcript of Foti, A., p. 2.

[14] 2022.03.21 Affidavit of Mary Lally, Dkt. 121-6, paragraph 7.

[15] 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8, paragraph 12.

[16] 2022.03.21 Declaration of Anna Francesca Foti, Dkt. 116, paragraph 11.

[17] Academic Transcript of Foti, A., p. 3.

[18] *Ibid.*

[19] https://www.linkedin.com/in/julia-durbeck-063338168/ viewed on April 4, 2022.

[20] Academic Transcript of Durbeck, J, p. 3.

[21] *Ibid.*

[22] 2022.03.21 Affidavit of Mary Lally, Dkt. 121-6, paragraph 7.

[23] Academic Transcript of Durbeck, J.

[24] https://www.linkedin.com/in/julia-durbeck-063338168/ viewed on April 4, 2022.

following costs for the Spring 2020 Semester: (a) Tuition, and/or (b) Fees (the "Class")"[25] claiming that Suffolk should provide them refunds.

Section A below provides a background on the tuition and fees allegedly at issue in this case. Section B summarizes Plaintiffs' Proposed Damages Theories.

## A.    Tuition & Fees

There are several distinct components of the tuition and fees allegedly at issue in this matter, which are described below.  In addition to tuition, Mss. Foti and Durbeck allege that students were mandated to pay an Activity Fee and a Technology Fee.[26]

As discussed below, Suffolk did not charge one price for these tuition and fees.  Suffolk posted different List Prices for its tuition and fees during the Spring 2020 Semester based upon student status (though, notably, for most programs at Suffolk, the prices of in-person and remote courses are the same).  For example, part-time undergraduate and graduate students were not charged the same fees.  I present the List Prices of these tuition and fees for the Spring 2020 Semester below. Additionally, as noted in Section VI below, most students did not pay these List Prices.

### 1.    Tuition

**Exhibit 3** shows that Suffolk posted List Prices for tuition for the Spring 2020 Semester based upon a student's program of study.

For example, Exhibit 3 shows that Suffolk posted different List Prices for tuition for the Spring 2020 Semester for its undergraduate, graduate and law school programs.  The List Price for tuition for full-time students range from $13,243 for the Spring 2020 Semester for programs such as the Undergraduate Post Baccalaureate Certificates of Radiation Therapy program to $24,705 for the Spring 2020 Semester of the Daytime Law School program.  List prices also vary within each graduate level (i.e., undergraduate, graduate or law) sub-program.  For example, full-time traditional undergraduates at the Boston campus were charged a List Price of $19,907 per semester, which allowed them to take 12 to 17 credit hours in-person and/or remotely.[27]  Suffolk also quoted a per credit hour List Price for undergraduates at the Boston campus.  Significantly, Suffolk charged the same List Price on a per-credit hour basis for its traditional Boston-based undergraduate program regardless of whether students enrolled in online or in-person courses.[28]

I also note that **Suffolk does not offer a separate online-only analogue to most of its in-person degree-granting programs**.  The only exception is the aforementioned Online MBA program, which charged a List Price of $1,171 per credit.[29]  On the other hand, full-time in-person MBA students were charged a per semester List Price of $22,785 for 12 to 15 credit hours.  Suffolk also

---

[25] Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113, p. 1.
[26] *Id.*, p. 7.  While Ms. Durbeck also was charged the List Price for a Lab Fee, the Plaintiffs do not seek class certification as to that fee specifically.  *See* Dkt. 113.
[27] SUFFOLK_00113445.
[28] While full-time traditional undergraduates at the Boston campus were charged one List Price, full-time undergraduates studying abroad at the Madrid campus were charged a lower $15,198 per semester List Price.
[29] SUFFOLK_00113445.

quoted a per credit hour List Price for in-person MBA students. This per credit hour List Price for in-person MBA students was $1,519 per credit hour.[30]

As discussed below in Section IX.D, Mss. Foti and Durbeck were charged List Prices of $19,907 for tuition for 12 to 17 credit hours during the Spring 2020 Semester. The financial aid they received allowed them to pay only a fraction of this List Price. As their financial aid differed, so did the tuition they actually paid.

### 2.    *Activity Fee*

According to the Plaintiffs' Complaint, the Activity Fee is allegedly

> intended to cover the costs of certain on-campus activities including but not limited to student organizations, intramurals, campus speakers and events, access to wellness centers and other facilities.[31]

The List Price for the Activity Fee for the Spring 2020 Semester was $90 for all full-time undergraduate students, $45 for part-time undergraduate students, $50 for all graduate students and law students if they were enrolled in the joint law degree programs and taking college courses.[32]

Therefore, the List Price for the Activity Fee relevant for Mss. Foti and Durbeck was $90 for the Spring 2020 Semester.[33] However, financial aid allowed Ms. Foti and Ms. Durbeck to pay at most 57% and 36% of the net cost of attendance, which would have included this price, respectively.[34]

### 3.    *Technology Fee*

According to the Plaintiffs' Complaint, the Technology Fee allegedly is

> intended to cover the costs of the campus internet technology infrastructure, including access to campus wi-fi services, computer labs, printing facilities, etc.[35]

As with the Activity Fee, the Technology Fee varied by program. The List Price for the Technology Fee for full-time students during the Spring 2020 Semester was $55 and $25 for all part-time students not enrolled in law programs. For a part-time law student, it was $40.[36]

---

[30] SUFFOLK_00113445.
[31] Plaintiff Durbeck's Amended Class Action Complaint and Demand for Jury Trial of Julia Durbeck ("Durbeck Complaint"), 20-110985-WGY, Dkt. 20, paragraph 148.
[32] SUFFOLK_00113445.
[33] 2022.03.21 Declaration of Julia Durbeck, Dkt. 117, Exhibit 1 and 2022.03.17 Declaration of Anna Francesca Foti, Dkt. 116, Exhibit 1.
[34] See Figure 8 below.
[35] Durbeck Complaint, Dkt. 20, paragraph 149.
[36] SUFFOLK_00113445.

The List Price for the Technology Fee relevant for Mss. Foti and Durbeck was $55 for the Spring 2020 semester.[37]  However, financial aid allowed Ms. Foti and Ms. Durbeck to pay at most 57% and 36% of the net cost of attendance, which would have included this price, respectively.

### 4.    Various Other Fees

Plaintiffs claim that Suffolk charges a "myriad" of other course-based fees, such as lab fees for certain courses.[38]  During the Spring 2020 Semester, Ms. Durbeck was assessed a Laboratory Fee for her biology class, which had a List Price of $75; Ms. Foti was not charged any other fees.[39]

## B.    The Plaintiffs' Proposed Damages Methodology

Mss. Foti and Durbeck allege that a common method could be used to calculate damages for all putative class members; however, the specific amount of alleged damages will vary among putative class members.  Their Proposed Damages Methodology depends on two variables: 1) the portion of the Spring 2020 Semester during which Suffolk conducted all classes on a remote basis and 2) the supposed difference in value between remote and in-person courses.[40]  I call their methodology the Plaintiffs' Prorated Per Capita Benchmark Tuition Damages Theory and further discuss this damages theory below.

First, Mss. Foti and Durbeck allege the remote portion was 55% of the Spring 2020 Semester. They arrived at this figure by dividing their estimate of the number of days during which all classes were remote by the total number of days they estimated to be in Suffolk's Spring 2020 Semester.[41]

Second, Mss. Foti and Durbeck allege that the difference in value between remote and in-person courses for all students, irrespective of program of study, could be calculated by looking at adjusted List Prices Suffolk charged MBA students.  The Plaintiffs note that the List Price for Suffolk's online MBA program was $1,171 per credit hour.  They then note that the List Price for Suffolk's in-person MBA program was $1,519 per credit hour.[42]  They did not analyze any other programs or the actual prices students paid.

Mss. Foti and Durbeck further assume that these two variables, when multiplied together, provide an accurate assessment of per capita alleged damages at $191.40 per credit hour (55% of the difference between $1,519 and 1,171).[43]

Mss. Foti and Durbeck allege that a similar process, which I call the Plaintiffs' Prorated Per Capita Benchmark Fee Damages Theory, can be used to obtain a classwide alleged damages amount for fees.[44]  The Plaintiffs did not provide any other alleged fee damage calculation details.

---

[37] 2022.03.21 Declaration of Julia Durbeck, Dkt. 117, Exhibit 1 and 2022.03.17 Declaration of Anna Francesca Foti, Dkt. 116, Exhibit 1.
[38] Durbeck Complaint, Dkt. 20, paragraph 39.
[39] 2022.03.21 Declaration of Julia Durbeck, Dkt. 117, Exhibit 1 and 2022.03.17 Declaration of Anna Francesca Foti, Dkt. 116, Exhibit 1.
[40] Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113, p. 15-16.
[41] *Id.*, p. 8 and p. 16 at footnote 38.
[42] *Id.*, p. 6.
[43] *Id.*, p. 16 at footnote 39.
[44] *Id.*

Mss. Foti and Durbeck only identified the broad framework of these Prorated Per Capita Benchmark Tuition and Fee Damages Theories and did not perform the full calculation of alleged damages. For example, they only calculated alleged per capita losses; they did not extrapolate these alleged per capita losses to all Suffolk students or all putative class members. Because of this and other extrapolation issues, their Proposed Theories did not identify all of the difficulties involved in calculating total damages for all putative class members.

## IV. Summary of Opinions

I continue this Expert Report by critiquing the framework provided that describes the outline of the Plaintiffs' Prorated Per Capita Benchmark Tuition and Fees Damages Theories. I reserve the right to update my opinions if and when a complete damages model is put forward.

Section V below demonstrates that irrespective of any model details Mss. Foti and Durbeck might provide, actual data show that putative class members were not damaged. Section VI explains how Mss. Foti and Durbeck has not put forth a proper damages model. Sections VII and VIII discuss fundamental flaws with Mss. Foti and Durbeck's proposed tuition and fee damages theories, respectively. Section IX shows that even if Mss. Foti and Durbeck could show that remote classes were somehow less valuable than in-person classes, putative class members still might not have been damaged. Section X shows that a complex analysis, which Mss. Foti and Durbeck have not performed, would be required to determine if Suffolk was unjustly enriched.

## V. Actual Data Contradict the Plaintiffs' Proposed Damages Theories and Are Consistent with Putative Class Members Not Being Damaged

As taught to me by someone who won the Nobel Prize for economic and statistical forecasting, it is generally preferable to base economic conclusions on actual data rather than hypothetical, often complex, models, which regularly contain a large number of explicit and implicit assumptions.

Consequently, contrary to the Plaintiffs' hypothesis, which is based upon a hypothetical comparison, actual, contemporaneous data are consistent with the likelihood that Suffolk students would have paid a similar amount in tuition and fees had they known in advance about the Spring 2020 Semester transition to remote classes and services as they did for in-person classes and services.

As discussed below, almost all Suffolk students were **<u>actually</u>** confronted with the hypothetical the Plaintiffs propose and elected to pay the same price as well as greater prices for remote classes and services as they did for in-person classes and services. As a result, the actual behavior of putative class members contradicts the Plaintiffs' Proposed Damages Theories.

## A.    Putative Class Members in Virtually All of Suffolk's Degree-Granting Programs During the Spring 2020 Semester Faced the Same List Price for Online and In-Person Classes

As an initial matter, even prior to the pandemic, for almost all programs at Suffolk, including the undergraduate program in which both Mss. Foti and Durbeck were enrolled, the List Price was identical whether a student took their classes in-person or online.[45]  For example, Suffolk does not have a separate online undergraduate degree-granting program.[46]  Within its traditional undergraduate program, Suffolk has historically offered courses both in-person and online at the same List Price.[47]  When Suffolk undergraduates elected to take some of their courses online, as Ms. Durbeck did, they were charged the same amounts as were their classmates who took all of their courses in-person.  Thus, for all 4,657 students enrolled in Suffolk's traditional undergraduate program during the Spring 2020 Semester, which comprises around two-thirds of all students enrolled at Suffolk that semester, there has historically been *no difference* in price between the List Prices of the courses they took in-person or online even prior to the pandemic.[48]  The same is true, in fact, for all 6,829 Suffolk students who were enrolled in the traditional degree-granting programs during the Spring 2020 Semester, or 97.9% of all students enrolled at Suffolk that semester.[49]

The Plaintiffs' Proposed Damages Theories do not take this crucial fact into account.  Counter to their allegations, actual Suffolk List Price data demonstrates that putative class members were not injured by the transition to remote instruction.

Indeed, only *one* degree-granting program at Suffolk, the MBA program in which neither Named Plaintiffs were enrolled, had a different List Price for online and in-person courses.[50]  The Plaintiffs incorrectly attempt to extrapolate the List Price difference from that one degree-granting program. Not only did multiple *in-person* programs actually have lower List Prices than the online MBA program, upon which the Plaintiffs' base their damages, but the MBA List Price difference they found would, at most, apply to the relatively small number of students in Suffolk's MBA program and not the vast majority of other putative class members.

## B.    Putative Class Members Had Paid the Same or Less for In-Person Classes As Compared To The Remote Classes During the Spring 2020 Semester

Underlying Mss. Foti and Durbeck's Proposed Damages Theories is the incorrect belief that remote classes are somehow so inferior to in-person classes that **all** putative class members would uniformly pay less for remote classes than in-person classes.

---

[45] 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8, paragraph 8.
[46] SUFFOLK_00113445.
[47] *Ibid.*
[48] Suffolk Enrollment - At Least 1 Online Course.xlsx & 02-05-2021 Spring Enrollment Report, p. 10. The total enrollment in Spring 2020 was 6,972.
[49] 02-05-2021 Spring Enrollment Report, p. 10. The total enrollment in Spring 2020 was 6,972.
[50] SUFFOLK_00113445.

Actual data contradicts such a belief. Many students who the Plaintiffs claim enrolled in in-person classes during the Spring 2020 Semester actually took remote classes. Before COVID hit, almost 9% of Suffolk degree-seeking undergraduates, including Ms. Durbeck, elected to take at least one remote class during the Spring 2020 Semester.[51] The List Price Suffolk charged did not vary whether an undergraduate student took all of their classes in-person or if they took a remote class.[52]

This List Price equivalence holds for most other programs offered by Suffolk. As a result, Mss. Foti and Durbeck incorrectly alleged that "there is a sharp difference in tuition, with the online tuition being significantly lower than in-person tuition for the same course or program."[53]

Despite the fact that, as discussed above, all but one degree-granting program at Suffolk had the same List Price for online and in-person courses,[54] Mss. Foti and Durbeck base their entire damages theories on that one program where a List Price difference exists between remote and in-person classes, Suffolk's MBA programs. **They incorrectly attempt to extrapolate the difference from that one program to all programs offered by Suffolk, including the undergraduate programs in which Mss. Foti and Durbeck were enrolled.** Mss. Foti and Durbeck provided no basis or explanation as to why such an extrapolation is valid, and why the List Price differential observed in the MBA program should be applied to other programs, especially programs where no price difference existed.

Even if one could extrapolate Suffolk's remote MBA List Prices to other programs as Mss. Foti and Durbeck attempt to do, a review of Suffolk's List Prices demonstrates that many putative class members were not damaged. As discussed above in Section III.B, the Plaintiffs allege that the value of a remote class is $1,171 per credit hour. Consequently, under the Plaintiffs' Proposed Damages Theories, students who enrolled in in-person classes whose List Prices was less than $1,171 per credit hour would not be damaged.

Suffolk offered many such in-person programs whose List Prices were less than or equal to $1,171 per credit hour or per course for the Spring 2020 Semester for full-time or part-time,[55] such as students enrolled in Suffolk's:

- Traditional Undergraduate Program
- Paralegal Studies Program
- Madrid Study Abroad Undergraduate Program
- Post Baccalaureate Certificate Program for Radiation Therapy
- Post Baccalaureate Certificate Program for Medical Dosimetry
- Master's Program in Mental Health Counseling
- Master's Program in Health Care Administration
- Master's Program in Public Administration

---

[51] Suffolk Enrollment - At Least 1 Online Course.xlsx.
[52] 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8, paragraph 8.
[53] Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113, p. 6.
[54] SUFFOLK_00113445.
[55] See Exhibit 3.

Suffolk offered many such in-person programs whose List Prices were less than or equal to $1,171 per credit hour or per course for the Spring 2020 Semester, which did not have a full-time equivalent,[56] such as:

- New England School of Art & Design Certificate
- New England School of Art & Design Continuing Education
- Certified Financial Planner (per course)
- MS in Mental Health Counseling/MS in Crime & Justice Studies
- Master in Public Administration /MS in Mental Health Counseling
- Graduate Certificate in Public Administration
- Graduate Certificate in Healthcare Management & Leadership
- Graduate Certificate in Healthcare Management: Performance Improvement & Data Analytics
- Graduate Certificate in State & Local Government
- Graduate Certificate in Nonprofit Management

Consequently, actual Suffolk student behavior shows that remote classes are **NOT** inferior to in-person classes such that **all** putative class members would pay less for remote classes than in-person classes. While it is possible that there could be some putative class members who **might** not pay the same price for remote classes as in-person classes, given that many did pay that amount, an individualized analysis would be required to determine which students, if any, would pay less for remote classes as well as to determine how much less they would pay. Mss. Foti and Durbeck ignore such individualized issues.

## C.    *Putative Class Members Paid Higher Prices for Semesters They Knew Would Be Impacted By COVID-19*

Before paying Suffolk tuition and fees for the Fall 2020 Semester, students knew that they would have some remote classes and not have access to full campus activities for part of that Semester. For example, on July 15, 2020, 80 days before the start of the Fall 2020 Semester, Suffolk announced that it would begin that Semester with a "combination of face-to-face and online classes, with most face-to-face classes being [hybrid]."[57] This announced educational environment included components that were similar to the environment that Suffolk students experienced during the remote class portion of the Spring 2020 Semester at issue in this lawsuit.

Not only was the educational environment for the Fall 2020 Semester similar to the one that Suffolk students experienced during the remote class portion of the Spring 2020 Semester at issue in this lawsuit, but Suffolk's List Prices were approximately 4% greater in the Fall 2020 Semester than in the Spring 2020 Semester.[58]

---

[56] *Ibid.*

[57] https://thesuffolkjournal.com/29603/news/suffolk-announces-big-changes-to-how-classes-housing-will-look-inthe-fall/ viewed on April 18, 2022.

[58] List prices for full-time undergraduates increased from $20,052 in 2019/20 (tuition, activity and technology fee were $19,907, $90, and $55, respectively) to $20,776 in 2020/21 (tuition, activity and technology fee were $20,621, $45, and $110, respectively). SUFFOLK_00113445.xlsx, 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8,

Consequently, all non-graduating Spring 2020 Semester students at Suffolk, including Ms. Foti, had to decide prior to the Fall 2020 Semester whether to enroll at Suffolk for the Fall 2020 Semester and to be taught in an education environment similar to the one for which the Plaintiffs claim they were overcharged, knowing that they would face "unreduced" List Prices.[59]  In particular, all Suffolk students were, in effect, posed with the following question prior to the Fall 2020 Semester:

> *Will you pay full tuition for the Fall 2020 Semester knowing that you will not have full in-person access to campus facilities and some classes will be taught remotely?*

Suffolk enrollment data demonstrate that **MOST** students **AGREED** to be charged full prices to receive an education in an environment similar to the one for which the Plaintiffs claim they were overcharged.  In particular, 73% of undergraduates who were in the first year at Suffolk during the Spring 2020 Semester reenrolled for the Fall 2020 Semester.[60]

This fact contradicts the Plaintiffs' claim that **all** putative class members were overcharged. Suffolk students' **actual decisions** demonstrate that most did not believe they were overcharged for the education they received during the remote portion of the Spring 2020 Semester. Consequently, at a minimum, any student who reenrolled at Suffolk for the Fall 2020 Semester, like Ms. Foti, was not damaged by Suffolk's alleged actions and should be excluded from the putative class.  Individualized analyses would be required to determine whether any Suffolk students who did not reenroll for the Fall 2020 Semester were damaged.  COVID-19 and remote education might not be the reason for their withdrawal as many students elect to not reenroll for other reasons.[61]

# VI.  The Plaintiffs Have Not Identified The Alleged Putative Class Members Nor Their Alleged Per Capita Loss

As discussed above, in order to properly calculate damages in a tuition and fee class action, one must at least identify how they will quantify the putative class members as well as the losses allegedly suffered by each putative class member.  Mss. Foti and Durbeck have done neither.  At best, they have provided some elements of information about the alleged losses for one putative class member type for one item they purchased.

First, Mss. Foti and Durbeck have not identified the number of putative class members.  As mentioned above, Mss. Foti and Durbeck believe that the putative class is:

> All students enrolled in an in-person/on-campus based program or classes at Suffolk University ("Suffolk"), and not any separate Suffolk online programs only,

---

paragraph 11 and https://www.suffolk.edu/about/directory/bursars-office/tuition-fees/tuition-rates-2020-21 viewed on April 18, 2022.

[59] *Id.*   https://thesuffolkjournal.com/29603/news/suffolk-announces-big-changes-to-how-classes-housing-will-look-in-the-fall/ viewed on April 18, 2022.

[60] Retention and Graduation.docx.  Suffolk typically tracks retention rates only for first-year undergraduates.

[61] https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021. Additionally, visa issues prevented some international students from reenrolling during the Fall 2020 Semester.

before March 11, 2020, **who paid** Suffolk any of the following costs for the Spring 2020 semester: (a) Tuition, and/or (b) Fees (the "Class").[62]

By limiting the putative class to students who paid Suffolk, the Plaintiffs realize that not all students paid the tuition and fees relating to their education. For example, third-parties such as parents, other relatives and financial aid providers, like Suffolk itself and various government entities, frequently pay tuition and fees for students.

As a result, a student on a full scholarship for the Spring 2020 Semester would not be part of the putative class as they did not pay tuition or fees to Suffolk. Mss. Foti and Durbeck have not identified the students who did not pay their tuition and scholarship who should be excluded from their putative class. Alternatively, they did not identify the students who paid Suffolk who should be included in the class.

Additionally, some students received partial financial aid for the Spring 2020 Semester, where third-parties paid part of the List Prices and the student paid for other parts. Not only have the Plaintiffs not identified such students, but their Proposed Damages Theories are inapplicable to such students. Their Theories assume that students pay the entirety of the List Prices for tuition and fees. As discussed above in Section III.B, the Plaintiffs propose that all students were overcharged by $191.40 per credit hour during the Spring 2020 Semester. However, some students who received partial financial aid likely received more than $191.40 per credit hour from third-parties.[63] The Plaintiffs' Damages Theories, thus, would imply that Suffolk overcharged such students by more than they actually paid Suffolk. As the Plaintiffs have not explained how someone could be overcharged by more than they actually paid, their Proposed Theories are inapplicable to students who only paid part of the List Price of Suffolk's tuition and fees. Students who received a partial scholarship of more than $191.40 per credit hour would also be overcompensated by the Plaintiffs' Proposed Damages Theories.

Only a small portion of the putative class are in a category where the Plaintiffs' proposed class and damages theories could be applicable. At least 80.3% of students enrolled in Suffolk's traditional in-person programs received institutional financial aid during the Spring 2020 Semester.[64] Consequently, the putative class would only contain at most 19.7% of the students enrolled at Suffolk during the Spring 2020 Semester. As some of these 19.7% of students had part of their tuition and fees paid for by other third-parties such as relatives and government agencies, the relevant number of students for whom the Plaintiffs' Proposed Damages Theories would be applicable would be even smaller. The Plaintiffs have not proposed a method to identify such students.

# VII. The Plaintiffs' Proposed Per Capita Prorated Benchmark Tuition Damages Theory Is Fatally Flawed

Notwithstanding the above, I discuss the flaws in Mss. Foti and Durbeck's Proposed Per Capita Prorated Benchmark Tuition Damages Theory as well as the individualized issues that are required

---

[62] Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113, p. 1 (emphasis added).
[63] Section VII.A.1 below shows that online students receive less financial aid.
[64] Spring 2020 Institutional Scholarships.xlsx & 02-05-2021 Spring Enrollment Report.pdf, p 10.

to employ this Theory below. I separately discuss the Benchmark portion and the Prorated portion of this Theory below in Sections A and B, respectively.

## A.    The Plaintiffs' Benchmark Methodology Is Fatally Flawed

Mss. Foti and Durbeck's Proposed Per Capita Prorated Benchmark Tuition Damages Theory utilizes Suffolk's online-only MBA program as a benchmark for what they believe Suffolk's tuition should have been during the remote portion of the Spring 2020 Semester. As enumerated by the American Institute of Certified Public Accountants, a benchmark damages theory must demonstrate that the benchmark is sufficiently comparable to the position each plaintiff would have been in but-for the defendants' allegedly improper activities.[65] The theory must also "consider other factors that could have caused the plaintiff's performance to differ from the [benchmark] selected and show how those factors have been taken into consideration."[66]

As discussed below, Mss. Foti and Durbeck did not demonstrate that Suffolk's online-only MBA programs are sufficiently comparable to the education **all** putative class members received during the remote portion of the Spring 2020 Semester.

### 1.    Suffolk's Online MBA Program Is Not Comparable To The Education Most Putative Class Members Received During The Remote Portion of the Spring 2020 Semester

Most putative class members were not seeking an MBA. In fact, just under 6% of all students at Suffolk were enrolled in an MBA program during the Fall 2020 Semester.[67] Consequently, the List Prices for Suffolk's in-person and online MBA programs, on which the Plaintiffs base their Proposed Damages Theories, are inapplicable to most putative class members.

As discussed above, a List Price differential does not exist for all other online classes offered by Suffolk. Consequently, a more appropriate benchmark under the Plaintiffs' Proposed Damages Theories, the List Price for a remote class that is comparable to the in-person class in which each putative class member was enrolled during the Spring 2020 Semester, demonstrates most putative class members for which comparable remote classes existed were not damaged.

Even if Suffolk's alleged MBA program price differential could be used as a benchmark for all other programs it offered and one could compare prices calculated using different pricing methodologies, the Plaintiffs' Proposed Damages Theories are further flawed because they do not investigate the prices students actually paid. Suffolk offers substantially more institutional financial aid to students enrolled in traditional in-person programs than to online-only students.[68] As discussed below in Section VII.A.2.b, over 80.3% of students enrolled in Suffolk's traditional in-person programs received institutional financial aid during the Spring 2020 Semester.[69] These

---

[65] Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013), paragraph 68.

[66] *Ibid*., paragraph 69.

[67] There were 417 students pursuing an MBA and 7,063 total students in the Spring 2020 Semester. 02-05-2021 Spring Enrollment Report.pdf, p. 10.

[68] Suffolk Student Aid 2020.xlsx.

[69] Spring 2020 Institutional Scholarships.xlsx & 02-05-2021 Spring Enrollment Report.pdf, p. 10.

5,486 traditional in-person students received a total of $50,417,008 in institutional aid.[70]  On the other hand, only 6 students, or 4.2% of students enrolled in Suffolk's online programs, received a total of $14,588 in institutional aid.[71]  Because students enrolled in traditional in-person programs received more institutional financial aid than remote students, the MBA program List Price differential the Plaintiffs calculated would overstate the differential of prices MBA students actually paid.  As the amount of financial aid each student receives is individualized, one could not calculate alleged damages utilizing a common formula.  At a minimum, individualized analyses would be required to determine each putative class member's financial aid in order to assess comparability.  The financial aid received from each student received from all sources must be subtracted before one could assess a proper price differential.  Further individualization would be required because as discussed in Section IX.A, financial aid would need to be recalculated if the List Price of Suffolk's tuition changed as the Plaintiffs propose.

Notwithstanding the above, the Plaintiffs have not demonstrated that other factors did not cause the price differential they identified.  Marketing 101 states that institutions charge different prices when products and services are sold to different consumer types.[72]  Students in Suffolk's in-person and online MBA programs have different characteristics.  While 95% of Suffolk in-person undergraduate students and 62% of law school students are full-time students,[73] no online graduate students are.[74]  While Suffolk aims to enroll first-time and transfer undergraduate students seeking a Bachelor's or graduate degree, Suffolk's online classes are designed for non-traditional, part-time students, such as working professional adults or people with busy schedules.[75]  Additionally, MBA students have different characteristics than others students, such as undergraduates.  As a result, the Plaintiffs did not dismiss the likelihood that the price differential they identified was caused by these different student characteristics.  Furthermore, the aforementioned differences in classes, price structure, degrees and value could also account for any price differential.  Suffolk could have set online List Prices to be more comparable to in-person prices if the characteristics of the former's students were more similar to those of the latter.  As the Plaintiffs did not demonstrate how such factors have been taken into consideration, they did not follow the damage calculation requirements set forth by the American Institute of Certified Public Accountants.

## 2.    *Properly Evaluating The Benchmark Portion of Mss. Foti and Durbeck's Proposed Per Capita Prorated Benchmark Tuition Damages Theory Requires Highly Individualized Analyses*

Notwithstanding the above, Mss. Foti and Durbeck's Proposed Prorated Per Capita Benchmark Tuition Damages Theory incorrectly assumes that **all** putative class members would consider the

---

[70] Spring 2020 Institutional Scholarships.xlsx.

[71] Suffolk Student Aid 2020.xlsx.

[72] https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-arethey-used.asp viewed on January 13, 2022.

[73] 02-05-2021 Spring Enrollment Report.pdf, p 10 and https://nces.ed.gov/collegenavigator/?q=suffolk&s=all&id=168005 viewed on April 14, 2022.

[74] 02-05-2021 Spring Enrollment Report.pdf, p 10.

[75] https://online.suffolk.edu/landing/boston-online-mba?SearchEngine=GoogleBrand&SearchKeyword=suffolk%20university%20mba&CampaignSourceCode=SU-GoogleBrand-MBA-non-NAT-1535269331&VendorAccountID=44116&MediaCampaignID=1535269331&MediaGroupID=55409464221&MediaAdID=587762714286&MediaKeywordID=kwd-339560010430&gclid=EAIaIQobChMIv6Oky5Kh9wIVFRvnCh2o3gjXEAAYASAAEgJU8fD_BwE viewed on April 19, 2022.

full semester online classes offered by Suffolk to be the best benchmark and comparable learning environment to what Suffolk students experienced during the remote portion of the Spring 2020 Semester.

Subsection a below demonstrates that the education putative class members received during the remote portion of the Spring 2020 Semester was actually similar to the education they received from their other in-person classes at Suffolk. As a result, the actual tuition they paid during the Spring 2020 Semester would be a better benchmark for their education during that semester than the benchmark proposed by the Plaintiffs. The Plaintiffs would have suffered no damages under such a scenario.

Even if there were some diminishment in value during the remote portion of the Spring 2020 Semester, the damages each putative class member allegedly suffered would be highly individualized. As discussed above, under the Plaintiffs' Proposed Damages Theories, damages equal the difference between what each putative class member actually paid Suffolk and the amount they should have paid. Subsection b below shows that the amount each putative class member paid is highly individualized. Subsection c shows that any alleged diminishment incurred would also be highly individualized.

> ### a. *Contemporaneous Data Show That The Value Putative Class Members Received from the Remote Class Portion of the Spring 2020 Semester Was Comparable To The Value They Received From Other In-Person Classes*

First, each semester Suffolk surveys its students asking them to rate their courses on a scale of 1 to 5, with 5 being the highest rating. Consequently, one would expect that if students felt that they received lesser value from the remote class portion of the Spring 2020 Semester than they expected from the in-person classroom environment they allegedly intended to have, they would give their courses lower ratings. However, this was not the case. As shown in ***Figures 1, 2 and 3*** below, Suffolk data show that course ratings during the Spring 2020 Semester were consistent with other semesters.

***Figure 1*** below shows average instructor ratings in Spring 2020 for the College of Arts & Sciences, Sawyer Business School and Suffolk Law School were consistent with other semesters.[76] Additionally, these ratings continued to generally increase for these colleges after Spring 2020 when there was ongoing remote learning at Suffolk.[77]

---

[76] Course Evaluations Summary Class Action.xlsx. Fall 2018.pdf. Fall 2019 Averages.pdf. Fall 2020.pdf. Fall 2021.pdf. Spring 2019.pdf. Spring 2020.pdf. Spring 2021.pdf. Each program's original questions regarding teacher ratings varied slightly. The original questions include: 1) CAS: "Overall: Rate the quality of instruction in this course as it contributed to your learning." 2) SBS: "Overall rating of the instructor." 3) Law: "Overall, this professor is an effective teacher."
[77] *Ibid*.

| Figure 1 Average Instructor Ratings | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Program** | **Fall 2018** | **Spring 2019** | **Fall 2019** | **Spring 2020** | **Fall 2020** | **Spring 2021** | **Fall 2021** |
| College of Arts & Sciences | n/a | n/a | n/a | 4.28 | 4.29 | 4.33 | 4.24 |
| Sawyer Business School | n/a | n/a | n/a | 4.47 | 4.55 | 4.58 | 4.56 |
| Suffolk Law School | 4.20 | 4.25 | 4.41 | 4.44 | 4.44 | 4.45 | 4.37 |

*Figure 2* below shows that students in these colleges did not feel that their instructors' availability outside of class declined during the Spring 2020 Semester as the Plaintiffs' proposed damages theory suggests.[78]   Furthermore, these ratings continued to increase for these colleges in subsequent semesters that utilized remote learning.[79]

| Figure 2 Average Availability of Instructor Outside of Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Program** | **Fall 2018** | **Spring 2019** | **Fall 2019** | **Spring 2020** | **Fall 2020** | **Spring 2021** | **Fall 2021** |
| College of Arts & Sciences | n/a | n/a | n/a | 4.39 | 4.42 | 4.46 | 4.35 |
| Sawyer Business School | n/a | n/a | n/a | 4.47 | 4.50 | 4.52 | 4.51 |
| Suffolk Law School | 4.25 | 4.30 | 4.45 | 4.53 | 4.54 | 4.57 | 4.45 |

*Figure 3* below shows how students in these colleges believed that their learning and understanding of course concepts during the Spring 2020 Semester was in line with other semesters.[80]

| Figure 3 Average Student Learning and Understanding of Course Concepts | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Program** | **Fall 2018** | **Spring 2019** | **Fall 2019** | **Spring 2020** | **Fall 2020** | **Spring 2021** | **Fall 2021** |
| College of Arts & Sciences | n/a | n/a | n/a | 4.26 | 4.29 | 4.36 | 4.25 |
| Sawyer Business School | n/a | n/a | n/a | 4.38 | 4.40 | 4.44 | 4.42 |
| Suffolk Law School | n/a | n/a | n/a | 4.34 | 4.28 | 4.33 | 4.23 |

Consequently, the general student body's course ratings are consistent with putative class members viewing the education they received during the remote portion of the Spring 2020 Semester to be comparable to the in-person education they received in other semesters.  In other words, the data

---

[78] *Ibid*. Each program's original questions regarding availability of instructor outside of class varied slightly. The original questions include: 1) CAS: "The instructor was sufficiently available for help outside of class" 2) SBS: "Instructor was responsive to students outside the classroom." 3) Law: "The professor was available to help students outside the classroom by being available to meet during regular office hours or scheduled appointments, as well as by responding to email or phone calls."

[79] *Ibid*.

[80] *Ibid*. Each program's original questions regarding student learning and understanding of course concepts varied slightly. The original questions include: 1) CAS: "I learned a great deal in the course." 2) SBS: "Course materials...helped me understand concepts and ideas related to the course." 3) Law: "I have learned and understand the fundamental principles of law and/or lawyering skills relevant to this course."

in Figures 1, 2 and 3 are inconsistent with the Plaintiffs' Proposed Damages Theories that putative class members received diminished value during the remote portion of the Spring 2020 Semester.

Second, at its core, the aim of Suffolk's classes is to educate students. One way to measure education is through students' Grade Point Average ("GPA"). Students who learn more generally receive higher grades. *Figure 4* below shows that average traditional student GPA increased from 3.14 in Fall 2019 to 3.21 in Spring 2020.[81] In addition, Ms. Durbeck achieved a 4.0 GPA in Spring 2020.[82]

| Figure 4 Average Semester GPA | | | | |
|---|---|---|---|---|
| Semester | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 |
| Fall | 3.14 | 3.16 | 3.14 | 3.21 |
| Spring | 3.14 | 3.15 | 3.21 | 3.23 |

Such data are consistent with students' education during the remote portion of the Spring 2020 Semester being comparable to the in-person education they received in other semesters. In other words, the data in Figure 4 are inconsistent with the Plaintiffs' Proposed Damages Theories that putative class members received diminished value during the remote portion of the Spring 2020 Semester.

Third, many students attend institutions of higher learning in order to enhance their earnings. *Figure 5* below shows that average starting salaries of Suffolk graduates increased after the 2019 – 2020 academic year.[83] This increase occurred in spite of the 2020 COVID-19 Recession, which significantly impacted the job market for college graduates. Economy-wide, there was a decrease in employment and labor force participation rates of recent college graduates in 2020, which exceeded the decline recent college graduates experienced during the Great Recession of 2008.[84]

| Figure 5 Average Starting Salary | |
|---|---|
| Graduation Date | Annual Salary |
| May 2017 | $44,295 |
| May 2018 | $46,814 |
| May 2019 | $48,527 |
| May 2020 | $49,430 |

Such data are consistent with students' education during the remote portion of the Spring 2020 Semester being comparable to the in-person education they received in other semesters. In other words, the data in Figure 5 are inconsistent with the Plaintiffs' Proposed Damages Theories that

---

[81] Average Undergraduate Cumulative GPA.xlsx.

[82] Academic Transcript of Durbeck, J., p. 3. On the other hand, Ms. Foti earned a 2.75 GPA (see Academic Transcript of Foti, A., p. 1). This demonstrates the different and individualized academic experiences that occurred in Spring 2020. Suffolk did offer a Credit/No Credit option during the Spring 2020 Semester, though neither Ms. Foti nor Ms. Durbeck elected to utilize that option.

[83] May UG Outcomes 2017-2020 4-14-22.xlsx.

[84] https://www.pewresearch.org/fact-tank/2021/05/14/college-graduates-in-the-year-of-covid-19-experienced-a-drop-in-employment-labor-force-participation/ viewed on September 22, 2021.

Confidential

putative class members received diminished value during the remote portion of the Spring 2020 Semester.

Fourth, even more to the core of Suffolk's mission, the school aims to graduate its students. **Figure 6** below shows graduation rates stayed relatively stable from 2017 to 2020.[85]  Such data are consistent with students' education not diminishing during the remote class portion of the Spring 2020 Semester.

| Figure 6 6-Year Graduation Rates | | | | |
|---|---|---|---|---|
| Description | 2017 | 2018 | 2019 | 2020 |
| % Graduated | 60% | 59% | 58% | 59% |

Such data are consistent with students' education during the remote portion of the Spring 2020 Semester being comparable to the in-person education they received in other semesters.  In other words, the data in Figure 6 are inconsistent with the Plaintiffs' Proposed Damages Theories that putative class members received diminished value during the remote portion of the Spring 2020 Semester.

Fifth, Mss. Foti and Durbeck's theory that students receive diminished value from remote classes is inconsistent with Nobel Prize-winning research.  In 1973, Michael Spence published a paper called "Job Market Signaling" in the *Quarterly Journal of Economics* for which he won the 2001 Nobel Prize in Economics.[86]  Dr. Spence, who was Dean of Stanford Business School, concluded that students do not need to learn anything for universities to confer value as completing an education conveys information about a student's inherent abilities.  He demonstrated that because more advanced individuals would have an easier time completing college than their less advanced counterparts, the latter would not attend universities.  Thus, college completion signals a student's strength even if college did not make them intellectually stronger.  This conclusion continues to hold as *New York Magazine* wrote in May 2020 that "no one has really come up with the ability to certify [potential hires] to the same extent that universities[' admissions departments] do."[87]

Because Mss. Foti and Durbeck have not disputed that a degree from Suffolk still provides a strong signal about and certification of a student's ability that allowed her to obtain employment, they cannot claim that students received a diminished value from the remote class portion of the Spring 2020 Semester.

Consequently, Nobel Prize-winning research is consistent with the value students received during the remote portion of the Spring 2020 Semester being comparable to the value they received in other semesters.  In other words, Nobel Prize-winning research is inconsistent with the Plaintiffs'

---

[85]  https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?unitId=168005&year=2017&surveyNumber=8  viewed on April 19, 2022.  The 'Total Students Pursuing a Bachelor's Degree' only includes students who began their education at Suffolk 6 years prior to the year in the table. For example, the 2020 column represents students pursuing a Bachelor's Degree and starting at Suffolk in 2014-2015 school year. "Graduated" includes students who started 6 years ago and graduated in the time before August 31 of their 6th year.
[86]  Spence, Michael "Job Market Signaling." *Quarterly Journal of Economics*. 87(3), 1992, pp. 355–374.
[87]  Walsh, James D. "The Coming Disruption," *New York Magazine*, May 11, 2020.

Proposed Damages Theories that putative class members received diminished value during the remote portion of the Spring 2020 Semester.

### b. *Individualized Net Prices*

Suffolk's List Prices for tuition and fees for the Spring 2020 Semester were highly individualized.

Suffolk's List Prices for tuition were highly individualized during the Spring 2020 Semester. Exhibit 3 of this Expert Report shows that Suffolk charged different List Prices to students in different programs. The Plaintiffs incorrectly ignore these different List Prices by claiming that all students were allegedly harmed by a uniform amount irrespective the List Price they actually faced.

Suffolk's List Prices for fees were highly individualized during the Spring 2020 Semester. While full-time undergraduates are charged the Activity Fee and Technology Fee, not all students were charged other various course fees. For example, Ms. Durbeck was charged a Lab Fee while Ms. Foti was not. Again, Mss. Foti and Durbeck provided no explanation of how to account for the individualized List Prices of the fees charged to Suffolk students in their Proposed Per Capita Prorated Benchmark Fee Damages Theory.

Not only do individualized issues arise with Suffolk's List Prices, but further individualized issues arise with the net prices students actually pay.

The List Prices for tuition and fees are the amounts that Suffolk states are being charged on its website and brochures. However, only a small percentage of students nationwide pay these List Prices as most students receive financial aid of some sort. At Suffolk, at least 80.3% of students in traditional programs received institutional financial aid and did not pay full List Price for tuition.[88] This percentage of students who did not pay full List Prices would be even higher if one considers other third-party payers. Consequently, Mss. Foti and Durbeck's Proposed Per Capita Prorated Benchmark Tuition Damages Theory is based on information that **is only applicable to only at most 19.7% of students enrolled in traditional programs**, their Proposed Damages Theories are not applicable to the entire putative class.

Furthermore, economists have found the university List Prices, which the Plaintiffs base their Proposed Per Capita Prorated Benchmark Tuition Damages Theory, to be "uninformative." In particular,

> the school's listed tuition [and fees] – its "list price" – is often about as **(un-)informative** as the list price of a car. Many students pay less than the list price, and hence any study using listed tuitions [and fees] as the price of education **will exaggerate** both the real cost to students and the school's tuition revenue….
>
> With financial aid in the form of a tuition discount common, list price is frequently less meaningful than "net tuition" – the discounted price – not to mention other forms of student aid, including loans and work-study jobs.[89]

---

[88] Spring 2020 Institutional Scholarships.xlsx & 02-05-2021 Spring Enrollment Report.pdf, p. 10.
[89] Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch Mission and Money: Understanding the University Cambridge University Press, 2008 ("Weisbrod"), p. 78 & 80. (emphasis added).

Because Mss. Foti and Durbeck's Proposed Per Capita Prorated Benchmark Tuition Damages Theory is based upon uninformative and exaggerated List Price data, their conclusions would likewise be uninformative and exaggerated.

Detailed calculations, which the Plaintiffs ignore, are required to determine net prices the university receives and the net prices that students actually pay. For example, if the List Price for tuition and fees were $25,000 and Suffolk granted a given student a $15,000 scholarship, the net price the university receives would be $10,000. If the student in question also received a $3,000 scholarship from their local Chamber of Commerce, the net price the student paid would be $7,000.

Because Suffolk customizes the scholarships it grants on an individualized basis, "[t]he net tuition [and fees] paid by students sitting in the same college classroom is often quite different, varying by student characteristics such as ability, income, and minority status."[90] Economists have found that universities' increased pricing sophistication has caused "the net price of college … [to] become increasingly individualized."[91] For example, *Figure 7* below shows that the average net price Suffolk receives varies by income level.[92]

| Figure 7 Average Net Price Suffolk Receives by Income Level | | |
|---|---|---|
| Income Level | 2019-2020 Average Net Price Suffolk Receives per Semester[93] | 2019-20 Average Net Price as a % of Cost of Attendance |
| $0 - $30,000 | $14,229 | 46% |
| $30,001 - $48,000 | $14,612 | 48% |
| $48,001 - $75,000 | $14,806 | 48% |
| $75,001 - $110,000 | $14,364 | 47% |
| $110,001 and more | $17,254 | 56% |

The amount of financial aid Suffolk offers a given student could be different than the aid another school might provide as "[d]ifferent schools may offer the same student different amounts of aid."[94]

As a result, individualized analyses would be required to determine the relevant tuition students actually paid that need to be placed in the Plaintiffs' damages formula.

---

[90] Epple, Dennis, David N. Figlio and Richard E. Romano (2004). "Competition Between Private and Public Schools: Testing Stratification and Pricing Predictions," *Journal of Public Economics*, 88(7-8), ("Epple"), p. 1.

[91] "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012 (Scott-Clayton 2012), p. 2.

[92] https://nces.ed.gov/collegenavigator/?q=suffolk&s=all&id=168005 viewed on April 14, 2022.

[93] Average net price is generated by subtracting the average amount of federal, state/local government, or institutional grant or scholarship aid from the total cost of attendance. Total cost of attendance is the sum of published tuition and required fees, books and supplies, and the weighted average for room and board and other expenses. For 2019-20, the average total cost of attendance for students on campus per semester was $30,608.

[94] Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013 ("Dynarski"), p. 14.

### c.    Even If There Were Some Diminishment in Value During the Remote Class Portion of the Spring 2020 Semester, That Diminishment Would Be Highly Individualized

First, different remote classes that putative class members attended possessed different characteristics. During the remote portion of Spring 2020 Semester, it is my understanding that some students attended classes via Zoom, while some may have had the option to view previously recorded lectures. As a result, putative class members were not similarly situated with what their educational environment was during the remote class portion of the Spring 2020 Semester and how the different environments compared to the environments from the first portion of the Spring 2020 Semester. Mss. Foti and Durbeck did not propose any method to measure the associated individualized values putative class members received from the different educational environments they experienced during the remote portion of the Spring 2020 Semester.

Second, Mss. Foti and Durbeck have not demonstrated that there was any diminishment in teacher-student interaction after Suffolk transitioned to the remote portion of the Spring 2020 Semester. While students still interacted with teachers and with their peers during Zoom classes, any diminishment in classroom interaction that might have occurred would be highly individualized as discussed in nationwide studies. For example, about half of the total course hours at universities across the country are high volume courses like Sociology 101.[95] The classroom interaction in such classes likely could be less impacted by a move to remote classes than specialized seminars.[96] Consequently, Suffolk students who attended large lecture classes might not have had much classroom interaction during the in-person portion of the Spring 2020 Semester. On the other hand, some students in small seminars might opt not to participate in classroom discussions irrespective of the teaching environment. Teacher student interactions can also differ by major. While the number of full time faculty members in majors like comparative literature and physics, in general, exceed the number of undergraduate degrees they annually award, other majors like psychology award 4 to 5 undergraduate degrees per faculty member.[97] Additionally, classroom discussion, which might vary by class and student makeup, greatly affects learning.[98] Class and professor history could also affect the value students received during the remote portion of the Spring 2020 Semester. Courses that were previously taught remotely by professors who had remote teaching experience could have better transitioned during the Spring 2020 Semester.[99] Mss. Foti and Durbeck did not propose any common, formulaic method to account for such individualized factors.

---

[95] Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012), p. 6.

[96] Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner *Journal of Economic Perspectives*: 23(2), 2009, p. 177.

[97] *Ibid*., p. 172.

[98] Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015, p. 15-16 and author's personal teaching experience.

[99] 97 of the in-person classes offered during the Spring 2020 Semester were previously offered remotely. Spring 20 on campus section previously offered online.xlsx.

Confidential

Third, as discussed in the prior subsection, course ratings stayed consistent on average during the Spring 2020 Semester.[100]  However, there is variability around the course ratings.  For example, as shown above in Figure 3, the Suffolk School of Law saw their highest rating in the Spring 2020 Semester, while other schools had differing results.[101] Mss. Foti and Durbeck did not address how their Proposed Damages Theories would account for such individualized beliefs about the Spring 2020 Semester.

Fourth, while GPAs and starting salaries were also relatively consistent during and after the Spring 2020 Semester, there was some variability as some students likely did better during and after that Semester while others did worse, a difference reflected even between Mss. Foti and Durbeck.

Fifth, Mss. Foti and Durbeck assume that all students are similarly situated.  This is incorrect as some students like Ms. Durbeck enrolled in remote classes for the Spring 2020 Semester.  The Plaintiffs have not shown why students who voluntarily enrolled in remote classes before the transition to remote classes suffered similar damages to students who had not enrolled in remote classes prior to the transition.

Sixth, Ms. Durbeck alleged that total teaching time was reduced for some of her classes.[102] Determining the total teaching time for each class Suffolk taught would be highly individualized.

## B.     The Plaintiff's Prorated Methodology Is Fatally Flawed

It is economically improper for the Plaintiffs to globally value portions of a semester as they attempt to do.  Students purchased learning over an entire Semester that is comprised of multiple days.  As a result, they purchased a bundle of days of learning.  As discussed in subsection 1 below, it is improper to assume what the price of components of that bundle are as Mss. Foti and Durbeck attempt to do in their proposed damages methodology.

Even if some prorated methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the remote class portion of the Spring 2020 Semester as the Plaintiffs attempt to do. Mss. Foti and Durbeck's assumption implies that each day in the Semester was equally valuable to all students.  While such an assumption might be convenient, it is not economically correct.  Not only does each student's marginal utility differ between putative class members as discussed in subsection 2, but the number of days students are on campus also varies on an individualized basis as discussed in subsection 3.

### 1.     The Plaintiffs Incorrectly Attempt to Apply a Different Pricing Methodology in Their Proposed Prorated Damages Methodology

Institutions can employ different pricing methodologies when selling their products and services.  For example, an institution can opt to sell a single product or bundled set of products.  Different pricing methodologies could be employed for each.  For example, a grocery store could sell a six-pack of soda for $3.00 and an individual can for $1.00.  A consumer cannot claim that the grocery

---

[100] Course Evaluations Summary Class Action.xlsx.  Fall 2018.pdf.  Fall 2019 Averages.pdf.  Fall 2020.pdf.  Fall 2021.pdf.  Spring 2019.pdf.  Spring 2020.pdf.  Spring 2021.pdf.
[101] *Ibid.*
[102] Durbeck Complaint, Dkt. 20, paragraph 31.

store overcharged them for the individual can. Because different consumer types might desire an individual can over a six-pack, the grocery store utilizes different pricing methodologies that are fine-tuned to the characteristics of the consumers that tend to purchase the product in question. As a result, one cannot look at the price of the six-pack and assume that because six cans cost $3.00, each can must cost $0.50 (= $3.00 / 6).

As discussed in my *Journal of Economic Behavior and Organization* paper, which was derived from my NSF funded research, whether the implied price of an individual product in a bundle is more or less than the price of the individual product if it was individually sold depends on the characteristics of the product and bundle. For example, convenience could cause consumers to purchase a bundle of a product and servicing of that product (e.g., extended warranty) even though it would be monetarily cheaper to purchase the product and servicing separately.

Current U.S. Treasury Secretary Janet Yellen co-authored with William James Adams one of the seminal economic articles on bundling in 1976.[103] They concluded that one cannot draw conclusions about the prices of individual components of a bundle from the bundled price. The infinite set of possible individual component prices that could be derived from the bundled price "seriously complicates public appraisal of …. [and] affects certain conclusions that may be drawn."[104] As another author wrote regarding the possible individual component prices can be derived from a bundled price, "nearly anything can happen with bundling."[105]

Mss. Foti and Durbeck's proposed damages methodology violates these economic maxims. In particular, they incorrectly assume that the List Price Suffolk charged for an entire semester could be translated into a daily List Price. For the reasons discussed above, there are an infinite set of possible daily List Prices that could be derived from the List Prices that span an entire semester. Subsections 2 and 3 below provide some possible reasons for different daily prices. Mss. Foti and Durbeck did not consider these possible differences in their proposed Prorated Damages Methodology.

As a result, it is economically improper for Mss. Foti and Durbeck to translate Suffolk's List Prices that span an entire semester into a daily List Price in their proposed Prorated Damages Methodology.

Furthermore, it is questionable whether it is proper to analyze per semester prices to assess alleged damages. While students pay on a semester basis, most are pursuing a degree that spans multiple semesters. Consequently, one could contend that it is proper to analyze the overall cost of a degree, not the cost of an individual semester. If one accepts the Plaintiffs' allegation that students had no meaningful choice other than continue with the remote portion of the Spring 2020 Semester, one could contend that students who had enrolled in Suffolk prior to the Spring 2020 Semester had no meaningful choice other than to continue with their education at Suffolk given the costs involved in transferring universities. This allegation would then imply that it is improper to investigate the costs students incurred for a particular semester; rather, one would have to investigate the costs for all semesters needed to complete a degree. As Mss. Foti and Durbeck did not analyze the cost of

[103] Adams, William James and Janet Yellen (1976) "Commodity Bundling and the Burden of Monopoly" *Quarterly Journal of Economics*, 90: ("Adams and Yellen"), p. 475-98
[104] *Ibid.*, p. 477 & 497.
[105] Varian, Hal R. "Price Discrimination," Working Paper, July 1987, p. 628.

a Suffolk degree, their proposed methodology did not address the question of interest under this scenario.

## 2.    *Marginal Utility Is Different For Each Student*

One standard economic maxim is that people generally obtain decreasing marginal utility for consuming products.[106]  In other words, the additional benefits one receives from consuming an additional unit of a product decreases as one consumes more.  For example, a person generally gets greater benefits from consuming the first slice of pizza than the tenth slice.

Mss. Foti and Durbeck's proposed prorated methodology does not consider whether students received greater benefits from in-person classes during the first part of the Spring 2020 Semester than they would have in the second part if Suffolk had not moved to all remote classes.  There are an enumerable number of individualized reasons why such an economic phenomenon could occur. For example, graduating seniors who had secured early employment or graduate school admission might view the second part of the Spring 2020 Semester differently than other students.

Consequently, the degree to which putative class members experienced decreasing marginal utility during the Spring 2020 Semester would be individualized.  Consequently, Mss. Foti and Durbeck cannot value putative class members' alleged losses with their pro-rata assumption.

## 3.    *The Number of Relevant Days Is Individualized*

Even if each day in the Spring 2020 Semester were equally valuable to all putative class members, the number of relevant days is highly individualized.  Mss. Foti and Durbeck suggest that their prorated percentage could be calculated by taking the number of days that Suffolk only offered remote classes divided by the total number of relevant days in the Spring 2020 Semester.  However, individualized analyses would be required to determine both the numerator and denominator of this proportion.

For example, the Spring 2020 Semester began with the first day of classes on January 13, 2020. This semester was scheduled to end with commencement, which occurred after May 5, 2020.  Not only did classes end prior to Suffolk's commencement, but classroom teaching ended earlier as the Spring 2020 Semester had a finals week after classroom teaching ended.[107]  These dates cause the Spring 2020 Semester to have different lengths for different students.  Students whose finals ended early in finals week might have left campus early, decreasing the length of their semester relative to students whose finals ended later.

Additionally, the number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Days where students did not have any classes;
- Students who had more classes on a given day;
- Students who went home for some or all weekends; and
- Students who infrequently attended professor office hours.

---

[106] https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on September 28, 2021.
[107]    https://www.suffolk.edu/academics/current-student-resources/academic-calendar/college-of-arts-and-sciences-and-sawyer-business-school viewed on April 14, 2022.

For example, if only instructional days were considered and a given student had classes on every one of those days, the remote portion of the Spring 2020 Semester would only comprise 48% of that semester as compared to the 55% that Mss. Foti and Durbeck claim.[108]

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Mss. Foti and Durbeck's unsupported assumption, any decreased price Suffolk might charge for the tuition and fees would be highly individualized and not necessarily tied to the number of days as alleged.

# VIII. The Plaintiffs' Proposed Per Capita Prorated Benchmark Fee Damages Theory Is Fatally Flawed

Mss. Foti and Durbeck did not specify the specific method they would utilize to estimate their alleged fee damages.

In absence of a specific methodology, I demonstrate in Subsection A below that Suffolk students received significant value from the services associated with the fees in question in this lawsuit during the remote portion of the Spring 2020 Semester. Oftentimes, that value exceeded the value they would have received had the students attended in-person classes.

Even if the services were "limited" in some way during the remote portion of the Spring 2020 Semester, the Plaintiffs do not provide a common formulaic methodology to assess the value of the "limited" services students might have received. Subsection B shows that individualized analyses would be required to assess the value of the added / different services each student received.

Even if the Plaintiffs could somehow show that they could calculate a value diminishment during a portion of the Spring 2020 Semester in a uniform, class-wide basis, Subsection C shows that such a diminishment would not necessarily be proportional to the number of days after Suffolk allegedly closed or reduced its services. If such a calculation needed to be performed, the relevant number of days would be highly individualized.

## A. Contemporaneous Data Show That Putative Class Members Received Value from the Remote Portion of the Spring 2020 Semester

Below, I explain how Plaintiffs mischaracterized the alleged lost services associated with each of the alleged fees and demonstrate the value that was received after the transition to remote classes.

---

[108] Instructional days excludes weekends and holidays. 48% is calculated by starting the Spring 2020 Semester with the first day of classes on January 13, 2020, considering March 9, 2020 as the transition date to online, and ending with the final day of exams on May 5, 2020.

### 1.    Activity Fee

Mss. Foti and Durbeck performed no analysis of the Activity Fee to demonstrate that students lost any associated services. In particular, Mss. Foti and Durbeck just asserted that the "fee is intended to cover the costs of certain on-campus student activities such as student organizations, intramurals, campus speakers and events, access to wellness centers and other facilities, etc.,"[109] and assumed putative class members lost value because students did not have access to "recreational facilities; could not participate in student activities and events; and were not able to seek basic on-campus health and treatment services."[110]

Assuming that value associated with the Activity Fee is flawed along multiple dimensions.

First, Suffolk's website states that the Activity Fee supports "[s]tudent organizations and student involvement."[111] The Activity Fee is a pass-through fee that the university provides directly to the Suffolk student government for its uses.[112] In other words, Suffolk does not retain Activity Fee funds, but rather makes it available to student organizations.

The student government in turn used that fee to support student activities and programming for those organizations that sought funding during Spring 2020.[113] The student government continued offering such events during the remote portion of the Spring 2020 Semester.[114] For example, student organizations continued offering events remotely like "Zoom Palooza" and retained Activity Fee funds that were not used in Spring 2020 for use in future semesters.[115] Thus, Suffolk students continued to receive the benefits of the Activity Fee during the remote portion of the Spring 2020 Semester and beyond.

Additionally, Activity Fee funds were used to provide students with remote access to personal counselors, academic advisors, and the chaplain; academic coaches and tutors; library staff; medical appointments, counseling, and psychiatric visits; performing arts-sponsored events; fitness classes; and religious and spiritual discussions.[116]

Therefore, Suffolk students still had access to and received alleged Activity Fee services after the university transitioned to remote classes. While these services might have had different characteristics than the services provided prior to the transition to remote classes, Mss. Foti and Durbeck have not shown that they are of lesser value. Even if an individual student found one of the services to be of lesser value, individualized analyses would be required to determine that value.

The Activity Fee was not earmarked to pay for recreational facilities; specific student activities and events; and basic on-campus health and treatment services as Mss. Foti and Durbeck claim. Activity Fee funds support student programs, services, and activities, and not access to any

---

[109] Durbeck Complaint, Dkt. 20, paragraph 34.

[110] *Id.*, paragraph 40.

[111] https://www.suffolk.edu/about/directory/bursars-office/fall-2020-bursars-faq viewed on April 14, 2022. See also 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8, paragraph 9.

[112] 2022.03.21 Affidavit of Sujata T. Puthussery, Dkt. 121-8, paragraph 9.

[113] *Id.*, paragraphs 9-10.

[114] SUFFOLK_00113670 - SUFFOLK_00113676.

[115] 2022.03.21 Affidavit of Ann Coyne, Dkt. 121-1, paragraph 10.

[116] *Id.*, paragraphs 4, 6 and 9.

particular on-campus facilities or services. Thus, Mss. Foti and Durbeck's assumption that any alleged loss of access to recreational facilities, student activities and events, and health / treatment services should fully explain the alleged value of the Activity Fee is definitionally not supported.

### 2. *Technology Fee*

Mss. Foti and Durbeck also performed no analysis of any alleged losses relating to the Technology Fee. The Plaintiffs just asserted that the "fee is intended to cover the costs of the campus internet technology infrastructure, including access to campus wi-fi services, computer labs, printing facilities, etc.,"[117] and putative class members allegedly lost value because students did not have access to "computer labs."[118]

Suffolk's website states that the Technology Fee "is used to support the University's information technology infrastructure."[119] Suffolk earmarks the Technology Fee for services and technologies that support the student learning experience and provide students and faculty with a preeminent environment for digitally facilitated teaching and learning.[120]

Suffolk provided even more technology services to its students during the remote portion of the Spring 2020 Semester than it did during the in-person portion.[121] As the Technology Fee "is used to support the University's information technology infrastructure,"[122] Suffolk used Technology Fee funds for such support as the transition to remote instruction and the accompanying remote platforms required far more intensive use of Suffolk's IT infrastructure and staff.[123] In fact, the Technology Fees collected did not even fully offset the costs of this transition.[124]

IT costs further increased as Suffolk ensured that all students had online access by providing loaner laptops, hot spots, and other needed technology for students to connect to remote services.[125] Meeting these needs cost Suffolk over $147,000.[126]

Not only did Suffolk require intensive use of its IT infrastructure and staff for implementing remote instruction, but, as mentioned above, it also provided students remote access to personal counselors, academic advisors, and the chaplain; academic coaches and tutors; library staff; medical appointments, counseling, and psychiatric visits; performing arts-sponsored events; fitness classes; and religious and spiritual discussions.[127]

---

[117] Durbeck Complaint, Dkt. 20, paragraph 36.
[118] *Id.*, paragraph 40.
[119] https://www.suffolk.edu/about/directory/bursars-office/fall-2020-bursars-faq viewed on April 14, 2022. See also Statement of Undisputed Material Facts in Support of Defendant Suffolk University's Motion for Summary Judgement, Dkt. 121, paragraph 37.
[120] 2022.03.21 Affidavit of Laura C. Sander, Dkt. 121-5, paragraph 9.
[121] SUFFOLK_00113633 - SUFFOLK_00113634, 2022.02.21 Affidavit of Julie Sandell, Dkt. 121-3, paragraph 4 and 2022.03.21 Affidavit of Ann Coyne, Dkt. 121-1, paragraphs 4-9.
[122] https://www.suffolk.edu/about/directory/bursars-office/fall-2020-bursars-faq viewed on April 14, 2022. See also Statement of Undisputed Material Facts in Support of Defendant Suffolk University's Motion for Summary Judgement, Dkt. 121, paragraph 37.
[123] 2022.03.21 Affidavit of Laura C. Sander, Dkt. 121-5, paragraph 10.
[124] *Id.*, paragraph 9.
[125] 2022.03.21 Affidavit of Ann Coyne, Dkt. 121-1, paragraph 5.
[126] Suffolk Additional IT Costs.xlsx.
[127] 2022.03.21 Affidavit of Ann Coyne, Dkt. 121-1, paragraphs 4, 6 and 9.

Therefore, Suffolk students still had access to and received Technology Fee services after it transitioned to remote classes. Thus, Mss. Foti and Durbeck's assumption that any alleged loss of access to computer labs should fully explain the alleged value of the Technology Fee is not supported.

While these services might have had different characteristics than the services provided prior to the transition to remote classes, Mss. Foti and Durbeck have not shown that they are of lesser value. Even if an individual student found one of the services to be of lesser value, individualized analyses would be required to determine that value.

### 3.    Other Fees

Mss. Foti and Durbeck also performed no analysis of the "myriad" of other course-based fees, such as lab fees for certain courses, to demonstrate that any services were allegedly lost, let alone on a class-wide basis. For example, Ms. Foti was not even charged a course-based fee. The Plaintiffs only noted that Ms. Durbeck paid a lab fee for her biology class, but no longer had access to laboratory facilities, which were allegedly a key component of the class.[128]

However, the Plaintiffs failed to mention that when Suffolk shifted to remote instruction, Suffolk faculty paid for and gave students access to simulation software for conducting lab work.[129] Therefore, students had access to virtual laboratory facilities, rather than physical laboratory facilities. While virtual facilities might have different characteristics than physical facilities, the former is not necessarily inferior as the Plaintiffs allege. An individualized analysis would be required to determine the relative value of the two facility types, which the Plaintiffs did not perform.

Thus, an individualized inquiry on a student-by-student basis would be required to assess if a Suffolk student took the course, was charged the fee, if the service that the fee funds was received, and if there was any lost service, the extent to which it was lost.

## B.    Even If There Were Some Diminishment in Value During the Time Suffolk Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized

If the Plaintiffs lost the option to access certain on-campus services and facilities, one should utilize options theory, which has been well developed in the financial literature, to value that alleged option loss, which the Plaintiffs did not do. Options theory demonstrates that even if access to certain on-campus services and facilities were denied, the Plaintiffs cannot claim that they could ignore individual student usage of such services because all students commonly paid for and were denied access to on-campus services and facilities.

Even though there was some denial of access to on-campus services and facilities, students would value that access differently depending upon their usage. Nobel Prize-winning options theory states that the value of an option to access certain services depends upon the likelihood of that

---

[128] Durbeck Complaint, Dkt. 20, paragraph 31.
[129] 2022.02.21 Affidavit of Julie Sandell, Dkt 121-3, paragraph 8.

person utilizing the services.[130]   An option would be worthless to someone who would never exercise it as compared to one who might.

Therefore, Suffolk students who do not utilize on-campus services, such as certain student activities, at all were not damaged by their transition to virtual services.  The option to access these services would be worthless to such students. These students would have been in the same economic position even if the services had not transitioned.  The services' transition did not reduce these students' effective irrelevant access to the services.

Even though students do not directly receive value from unutilized campus services, one educator found that "the majority of students agree that they should fund programs they may never utilize with student fees."[131]   Consequently, students do not pay tuition and fees for access to unutilized campus services as the Plaintiffs allege.

Because students utilize the campus in different ways, any losses they might have suffered because they were allegedly denied access to certain on-campus services would also be different and need to be individually analyzed.  Utilizing options-pricing terminology, because the likelihood a given student would utilize a given service as well as the value that student would receive if it were utilized varies from student-to-student, so would the value of access to those services if utilized. Therefore, any alleged diminishment in campus use and its associated value also would be highly individualized.

Individualized analyses would be required to determine the likelihood of a given student utilizing certain services.  For example, studies have even shown that certain demographics (e.g., commuter students) tend to not utilize certain on-campus services, like certain student clubs.[132]   Also, some students may attend club events weekly; others might have different social outlets, including going to their primary residence on weekends.  Freshman might utilize the clubs in different ways than upperclassmen.   Additionally, studies have shown that students who pay fees themselves (as opposed to parents or other third-parties) are more likely to utilize the services associated with those fees.[133]

Furthermore, Mss. Foti and Durbeck were not damaged because of the alleged denial of access as it is my understanding that they did not utilize many of the services associated with the allegedly relevant fees.

Even if Suffolk did deny students access to some physical services, Suffolk provided replacement virtual services.  For example, even though Ms. Durbeck could not access physical laboratory facilities, Suffolk paid for and gave students access to simulation software for conducting lab

---

[130] Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–54, http://www.jstor.org/stable/1831029.  On p. 638, it states "...if the price of the stock is much less than the exercise price, the option is almost sure to expire without being exercised, so its value will be near zero."

[131] Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"),  p. 20.

[132] Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"), p. 142.

[133] For example, see a discussion of how payment methodology could affect consumption in Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on January 17, 2021.

work.[134]  While on-campus meetings & events, face-to-face counseling and medical appointments might have been limited, students had access to virtual meetings, events and appointments.  While students might not have had physical access to Suffolk's libraries, "all students had online access by providing loaner laptops, hot spots, and other technology options to students who did not have computers or who had poor internet access or other difficulties connecting to Suffolk's remote system. Further, key library resources were available remotely."[135]

Even if these virtual replacements would be considered part performance of what students believed or expected they should have received, the value of that part performance needs to be accounted for in a damages calculation,[136] which the Plaintiffs did not do.  The Plaintiffs have not valued these virtual replacements.  They have not demonstrated that the virtual replacements Suffolk provided were less valuable than the physical access that they claim putative class members were denied or the degree to which they allegedly were less valuable.  Given student differences, these valuations likely would be highly individualized.

Consequently, it is incorrect for the Plaintiffs to assert that the alleged losses due to the denial of access to some physical services could be measured by the total fees paid pro-rated for the portion of the semester for which access was unavailable.  The value of the virtual replacement services needs to be deducted.

Notwithstanding these virtual replacements, it is questionable if students would have physically accessed the allegedly lost services but-for Suffolk's actions.  For example, during the Spring 2020 Semester, many Suffolk students voluntarily opted not to congregate with other people for fear of catching COVID-19.  Such students likely would not have utilized in-person student activities even if they occurred.  As a result, Suffolk's actions did not harm such COVID-careful students.

Consequently, if access was a proper means to assess damages as the Plaintiffs allege, the different ways students utilize campus services and the value they receive from their use, especially amidst COVID-19, would cause damages to be highly individualized.

## C.    The Number of Days Cannot Be Utilized to Calculate Prorated Damages

Even if some prorated methodology were viable, it is economically incorrect to assume that the putative class members' diminished value would be proportional to the number of days of the remote class portion of the Spring 2020 Semester.

As discussed above in Section VII.B., such an assumption implies that the List Prices for a semester-long bundle of days could be translated into a daily List Price.  Additionally, Mss. Foti and Durbeck's assumption incorrectly implies that each day in the Semester was equally valuable to each student.  While such assumptions might be convenient, they are not economically correct.  Not only is it economically improper to calculate individual component prices from a bundled price and to assume the marginal utility received from each day of learning is the same for all

---

[134] 2022.02.21 Affidavit of Julie Sandell, Dkt 121-3, paragraph 8.
[135] 2022.03.21 Affidavit of Ann Coyne, Dkt. 121-3, paragraph 5.
[136] Restatement (Second) of Contracts, Section 377.  AICPA Lost Profits Guide, paragraph 4.

putative class members, but the number of days students are on campus also varies on an individualized basis.

Section VII.B.2 shows that each student's marginal utility is different for tuition. This also holds for the services associated with the fees allegedly at issue in this matter. It is possible that some students received greater benefits from access to campus services during the first part of the Spring 2020 Semester than they would have in the second part if Suffolk had not closed campus or moved to virtual services. For example, students with a New Year's Resolution may be motivated to use the gym at the beginning of the semester, but lose motivation and no longer go to the gym by mid-March, when the gym physically closed, or workout outside once the weather became nicer in Boston. Students may also study more and utilize fewer services as finals approach. Conversely, there could be some students who would work out more in the gym as a stress relief during finals.

Additionally, as discussed in Section VII.B.3, the number of relevant days to utilize in the Plaintiff's Proposed Per Capita Prorated Benchmark Fee Damages Theory is highly individualized. The number of relevant days and the value of those days would vary by numerous factors including, but not limited to:

- Days where students did not have any on-campus activities;
- Students who had more on-campus activities on a given day; and
- Students who went home for some or all weekends.

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Plaintiffs' unsupported assumption, any decreased price Suffolk might charge for the fees would be highly individualized and not necessarily tied to the number of days as alleged.

## IX. Even if Mss. Foti & Durbeck Were Able to Demonstrate that Suffolk's Spring 2020 Semester Was Less Valuable in Some Way, Putative Class Members Were Not Necessarily Damaged

Notwithstanding the aforementioned, even if Mss. Foti and Durbeck were able to demonstrate students received less value because of the transition to remote classes, they might not have been damaged for multiple reasons.

### A. Students Receiving Financial Aid Might Not Be Damaged

University officers dispensing Federal and institutional need-based financial aid at least partially base their aid recommendations on the school's Cost of Attendance and the student's Expected Family Contribution.[137]

---

[137] The Cost of Attendance is the amount it will cost a student to attend a university. The COA includes an estimate of tuition and fees; the cost of room and board (or living expenses for students who do not contract with the school for room and board); the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a

Financial aid officers regularly address situations where a student's Cost of Attendance or Expected Family Contribution changes during a term. In such an instance, Suffolk's Office of Financial Aid could reduce the grants or scholarships it awarded.[138]

In this lawsuit, students are seeking a refund of tuition and fees. If such a refund were to occur, every student's Cost of Attendance could change. As a result, Suffolk's Office of Financial Aid could recalculate its institutional grants, scholarships and loans it provided to all students. For example, suppose that Suffolk's List Prices for tuition and fees were $25,000, and that Suffolk's Office of Financial Aid determined that a given student's family should only contribute $10,000 toward the student's education in that year. In this situation, Suffolk could provide this student with a $15,000 scholarship.

Assuming that the Finder of Fact in this lawsuit determines that the combined List Prices for Suffolk's tuition and fees should have been $1 lower. This would cause the total List Prices for tuition and fees to fall to $24,999. The Office of Financial Aid **might** still determine that the given student's family should only contribute $10,000. In this revised situation, Suffolk would provide this student with a $14,999 scholarship.

In this example, the student would not be damaged by the supposed tuition and fee overcharge. The student actually paid $10,000 and would have paid $10,000 if the tuition and fees were "properly" priced. Therefore, this student incurred no out-of-pocket losses from Suffolk's alleged actions.

Even if Suffolk did not adjust this student's scholarship amount, the Plaintiffs likely could not claim damages as this hypothetical student paid $10,000 to receive something that had $24,999 in value.

Additionally, COVID-19 could further affect students' available finances. While some families could have been adversely affected by COVID-19, others saw their financial positions greatly improved during the Spring 2020 Semester. As a result, students' Expected Family Contribution could also change, which could add additional individualized potential modifications to the financial aid Suffolk provides its students. For example, as discussed below, many students received COVID-relief funds from the university during the Spring 2020 Semester.

Therefore, if it is determined that Suffolk's tuition and fees should have been lower, at a minimum, Suffolk's Office of Financial Aid could have to recalculate all the aid it provided students. To determine the amount that students were damaged by Suffolk's allegedly improper tuition and

---

reasonable amount for the documented cost of a personal computer); an allowance for child care or other dependent care; costs related to a disability; and/or reasonable costs for eligible study-abroad programs.

The Expected Family Contribution is determined from the Federal government's Free Application for Federal Student Aid ("FAFSA") form. Students provide detailed family financial information as well as information about the schools students are considering attending on the FAFSA form. Suffolk's Office of Financial Aid utilizes the information reported on the FAFSA form to calculate the EFC, which is how much money a student's family could contribute if the student were to attend Suffolk. The formula includes information on the student's/family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security), as well as demographic characteristics such as the student's family size and the number of family members who will attend college during the year. See https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022.

[138] For example, see https://www.suffolk.edu/student-financial-services/eligibility/enrollment-status viewed on May 4, 2022.

fees, one would have to, at a minimum, calculate the supposed tuition overcharge and subtract out any financial aid changes caused by Cost of Attendance and other COVID-related changes.

Because the aid the Office of Financial Aid provides is highly individualized, any aid recalculation also would be highly individualized.  Consequently, properly determining any economic loss students might have suffered because of any alleged tuition and fee overcharge would also be highly individualized.  As a result, I do not know how any economically proper refunds of these net prices could be calculated on a uniform formulaic, class-wide basis.

Essentially, the Plaintiffs are claiming that had they, and all other Suffolk students, known that COVID were going to occur during the Spring 2020 Semester, they would have paid less for tuition than they actually did.

However, with such a claim, one must fully analyze all of the economic effects on the students; one cannot isolate one's analysis to just tuition and fees.

For example, as of April 10, 2022, Suffolk distributed over $10 million in CARES Act payments made by Suffolk to over 5,000 students who applied for assistance during the pandemic.[139]  In addition, Suffolk has provided over $650,000 of institutionally-funded scholarships to 339 students who were negatively impacted by the pandemic either due to job loss or illness.[140]  Because these COVID-relief payments, like the alleged tuition and fee overcharges, would not have happened but-for COVID, any COVID-relief money students received would have to be subtracted from any damages award.  As Plaintiffs have a duty to mitigate, the COVID-relief money that students would have received had they applied also needs to be subtracted from damages.

Because students could have received different COVID-relief payments, this damages adjustment would also be individualized.

## B.    Students Who Did Not Pay Their Own Tuition Would Not Be Damaged, Which Further Creates Individualized Issues

As mentioned above, the Plaintiffs are seeking to certify the following putative class:

> All students enrolled in an in-person/on-campus based program or classes at Suffolk University ("Suffolk"), and not any separate Suffolk online programs only, before March 11, 2020, **who paid** Suffolk any of the following costs for the Spring 2020 semester: (a) Tuition, and/or (b) Fees (the "Class").[141]

Thus, students who did not pay their own tuition would not be damaged because they are not included in the putative class.  This definition recognizes that only the student who actually paid tuition and fees could have potentially suffered economic injury.  Those who paid tuition and fees

---

[139]  https://www.suffolk.edu/student-financial-services/types-of-financial-aid/cares-act-higher-education-emergency-grant-for-students viewed on May 4, 2022.
[140] COVID Scholarship Aid.xlsx.
[141] Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113, p. 1 (emphasis added).

would not only be students, but also family members or other benefactors who paid the students' tuition and fees. This further creates individualized issues amongst the putative class.

First, since the class is defined to include students who paid tuition, it would be necessary to identify each individual student's source of funds. I know of no unified source that contains such information as Suffolk does not record such information.

Second, there are additional individualized issues based on family wealth. For example, students from wealthier families could have different views about the alleged overcharges than less well-off student payors. Wealth effects are demonstrated by the recent college admissions scandal where people paid millions for college admittance.[142] These dichotomies could cause payers to react differently to changing environments such as a switch to remote learning.

Third, by giving financial aid to its students, Suffolk effectively paid tuition and fees for students. As a result, Suffolk should receive at least a portion of any alleged refund awarded to students who received financial aid. As discussed above, the calculation of the magnitude of this portion would be highly individualized.

Consequently, individualized analyses would be required to determine any resulting losses putative class members might have suffered due to the campus closures in Spring 2020.

## C.    Past Refunds Would Offset Any Alleged Damages

In addition to COVID-related aid, Suffolk refunded portions of travel fees and Executive MBA tuition. More specifically, Suffolk refunded:

- a sum of $158,265 to students relating to travel fees because out of state travel was prohibited.[143]
- $100,955 to executive MBA students relating to the portion of their tuition that is attributable to required travel.[144]

Thus, if the student previously received a refund, then these refunds would need to be individually deducted from any alleged damages from the putative class. Mss. Foti and Durbeck have proposed no procedure to apply these individualized refunds in any damages calculation.

## D.    The Named Plaintiffs, Mss. Foti and Durbeck, Were Not Damaged Because They Received Financial Aid

As mentioned above, the Plaintiffs have not put forth a complete damages model and only theorized that all the putative class members were damaged. In fact, Mss. Foti and Durbeck have not even demonstrated how they would calculate damages for themselves. Therefore, I will demonstrate below how the Named Plaintiffs were not damaged under their own Proposed

---

[142] For example, see www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html viewed June 17, 2021.
[143] Defendant Suffolk University Amended Second Supplemental Responses to Plaintiffs' First Set of Interrogatories, 2022.02.25, Response to Interrogatory No. 6.
[144] *Id.*

Damages Theories because they were undergraduates and received a substantial amount of financial aid.

As mentioned above, Plaintiffs have only theorized that all the online programs at Suffolk cost less than in-person programs, and they have only presented one program, the online MBA ($1,171 per credit hour), that has a List Price less than its in-person List Price ($1,519 per credit hour). However, Mss. Foti and Durbeck are undergraduate students, and Suffolk does not have a separate online-only program for undergraduates.  In fact, undergraduates have historically paid the same List Price per credit hour for an online and in-person class within their degree program.  Thus, there would be no difference in List Price for undergraduates taking online classes and no damages under the Plaintiffs' theory.

As discussed above in Section III.B, the Plaintiffs allege that the value of a remote class is $1,171 per credit hour.  Consequently, under the Plaintiffs' Proposed Damages Theories, students who enrolled in in-person classes and paid less than $1,171 per credit hour would not be damaged. Alternatively, since the online MBA List Price is 77.1% of, or 22.9% less than, the MBA in-person List Price per credit hour rate (=$1,171 / $1,519),[145] under the Plaintiffs' Proposed Damages Theories, students who enrolled in in-person classes and paid less than 77.1% of the List Price of their classes would not be damaged.

Mss. Foti and Durbeck were not damaged under both scenarios because of the financial aid they received during the Spring 2020 Semester.  *Figure 8* below displays Mss. Foti and Durbeck's summarized account statement and financial aid for the Spring 2020 Semester.

| Figure 8 Spring 2020 Semester Tuition, Fees and Financial Aid for Named Plaintiffs[146] | | |
|---|---|---|
| **Description** | **Ms. Foti** | **Ms. Durbeck** |
| Credits Enrolled | 16 | 12 |
| List Price per Credit | $1,244 | $1,659 |
| **List Price Tuition** | **$19,907** | **$19,907** |
| **List Price Fees** | | |
| Activity Fee | $90 | $90 |
| Technology Fee | $55 | $55 |
| Laboratory Fee | $0 | $75 |
| **Subtotal – List Price Fees** | **$145** | **$220** |
| **Total – List Price Tuition & Fees** | **$20,052** | **$20,127** |
| Institutional Scholarships / Grants | $8,750 | $13,037 |
| **Net Price (List Price Tuition & Fees less Financial Aid)** | **$11,302** | **$7,090** |
| **Net Price per Credit Hour** | **$706** | **$591** |
| **Net Price as a % of Total List Price** | **56.4%** | **35.2%** |

Figure 8 shows that after deducting financial aid, both Mss. Foti and Durbeck both actually paid less than the Plaintiffs' allegedly relevant online price of $1,171 per credit hour. Mss. Foti and

---

[145] SUFFOLK_00113445.
[146] 2022.03.21 Declaration of Julia Durbeck, Dkt. 117, Exhibit 1 and 2022.03.17 Declaration of Anna Francesca Foti, Dkt. 116, Exhibit 1.

Durbeck's Net Price per credit hour was $706 and $591, respectively.[147]  Thus, both Named Plaintiffs were not damaged under their Proposed Damages Theories because they paid less than the alleged price they claim they should have paid for online classes.

Alternatively, Figure 8 also shows that both Mss. Foti and Durbeck already paid less than 77.1% of their respective List Prices due to the financial they received.  After deducting financial aid, Mss. Foti and Durbeck's Net Price as a percentage of their total List Price was 56.4% and 35.2%, respectively.[148]  Thus, both Named Plaintiffs were not damaged under their Proposed Damages Theories because the percentage they paid of their List Prices was less than the allegedly relevant percentage.

Therefore, Mss. Foti and Durbeck have not presented a proper damages model to even calculate any alleged damages for themselves or explained how their proposed damages theory will properly apply to all putative class members.

# X.  Mss. Foti and Durbeck's Damages Theory Does Not Demonstrate That Suffolk Was Unjustly Enriched

It is my understanding that the Plaintiffs have not addressed the issue of alleged unjust enrichment damages.  I reserve the right to update my opinions if and when a complete unjust enrichment calculation is put forward as damages modeling is complex, making a complete identification of all required steps difficult without a baseline calculation.

In evaluating unjust enrichment, one cannot only look at the alleged benefits the defendant received.  One must also look at the costs and lost benefits simultaneously incurred.  Mss. Foti and Durbeck's proposed damages theory only "addresses" the tuition and fees Suffolk students paid.  However, other items need to be analyzed in order to determine if Suffolk was unjustly enriched.  Any proper unjust enrichment analysis must, at least, analyze whether Suffolk incurred significant costs and sacrificed revenue, which Suffolk did.

Suffolk's costs of providing remote instruction are vital to such an analysis.  Like many universities, Suffolk's transition to remote classes caused it to forgo a large amount of income.  For example, it incurred $147,000 in additional expenditures to continue to provide services in the form of laptops, monitors, tablets, headsets, adapters, computer cameras, Examsoft software for online test taking, laboratory simulation kits and additional Zoom licensure.[149]  Suffolk bore additional costs to make the campus safer for when students returned such as costs relating to the "purchases of personal protective equipment (PPE), purchases of cleaning supplies, adding personnel to increase the frequency of cleaning, [and] reconfiguration of facilities to promote

---

[147] The Named Plaintiffs' Net Price per credit conservatively includes the tuition and fees.  Under Plaintiffs' proposed methodology of comparing online and in-person prices, they have only shown a comparison of tuition prices, not fees.  Thus, if I excluded fees, the named plaintiffs' Net Price per credit would be even less at $697 and $573 per credit for Mss. Foti and Durbeck, respectively.

[148] The Named Plaintiffs' Net Price per credit conservatively includes the tuition and fees.  Under Plaintiffs' proposed methodology of comparing online and in-person prices, they have only shown a comparison of tuition prices, not fees.  Thus, if I excluded fees, the named plaintiffs' tuition Net Price as a percentage of List Price would be even less at 56.0% and 34.5% for Mss. Foti and Durbeck, respectively.

[149]  Suffolk Additional IT Costs.xlsx.

Confidential

social distancing."[150]    Even though students might not have reaped the benefits of such modifications during the Spring 2020 Semester, those costs were borne or identified during that semester.  These costs are akin to the costs students pay for to renovate a campus building.  If a portion of the building is closed during renovations, students bear the costs in one semester, but reap the benefits of the renovation in subsequent semesters.

Suffolk's lost revenue is also vital to any unjust enrichment analysis.  Suffolk also lost millions of dollars in auxiliary revenue.[151]    For example, Suffolk refunded students money they paid for housing, room & board and other fees.  The return of room and board and other fees was an unexpected expense that needs to be deducted from any unjust enrichment calculation.  Even though it did not earn revenue from these items during the campus closure, Suffolk still incurred expenses relating to building costs, staffing and other items.  Furthermore, Suffolk did not receive revenue from sporting events, the bookstore, laundry machines, vending machines and other retail establishments during the campus closure, which would also have to be deducted from any unjust enrichment calculation.  As discussed above, other analyses are likely required, which are difficult to identify without a baseline calculation.

As Mss. Foti and Durbeck do not contemplate such revenue and fees, their theory cannot be utilized to analyze Suffolk's alleged unjust enrichment.

# XI.  Conclusion

Mss. Foti and Durbeck's proposed damages methodology is flawed along multiple dimensions. First, it ignores the fact that, for the vast majority of Suffolk's degree-granting programs, the cost of courses taken in-person and remotely have historically been the same.  Second, it assumes that students would demand to pay less for remote classes even though they actually exhibited contradictory behavior by paying similar amounts when confronted with a similar situation.  Third, at best, their proposed damages methodology assesses alleged per capita losses for one type of putative class member, MBA students, for tuition, but not fees.  Not only do they not identify alleged per capita losses for other putative members, but they do not quantify the number of putative class members of each type.  Fourth, their proposed damages methodology is further flawed because it assumes that all students would view the Suffolk online MBA program as a comparable education environment, when Mss. Foti and Durbeck would not even be eligible for online MBA classes.  Fifth, Mss. Foti and Durbeck ignored the values and services that Suffolk did provide when it offered remote classes.  Sixth, even if Mss. Foti and Durbeck were able to demonstrate that Suffolk's Spring 2020 Semester was less valuable in some way, putative class members were not necessarily damaged.

May 5, 2022

_____

Benjamin S. Wilner, Ph.D.

---

[150]  https://www.suffolk.edu/-/media/suffolk/documents/student-financial-services/types-of-financial-aid/cares-act/he erf-reporting-form-1840-0849-20211231.pdf?la=en&hash=2158AE4EF9E94B421631ED4B61D9A96EA9B7  7F90 viewed on April 29, 2022.
[151]  18-19  Suffolk University - Financial Statements 6-30-2019.pdf & 19-20 Suffolk University - Financial Statements 2020.06.30.pdf.

Exhibit 1

**Suffolk University COVID Refund Litigation**
**Documents Considered**

| I. Legal Filings |
| --- |
| 2022.03.21 Affidavit of Ann Coyne in Support of Defendant Suffolk University's Motion for Summary Judgment, Dkt. 121-1. |
| 2022.02.21 Affidavit of Julie Sandell in Support of Defendant Suffolk University's Motion for Summary Judgment, Dkt 121-3. |
| 2022.03.21 Affidavit of Laura C. Sander in Support of Defendant Suffolk University's Motion for Summary Judgment, Dkt. 121-5. |
| 2022.03.21 Affidavit of Mary Lally in Support of Defendant Suffolk University's Motion for Summary Judgment, Dkt. 121-6. |
| 2022.03.21 Affidavit of Sujata T. Puthussery in Support of Defendant Suffolk University's Motion for Summary Judgment, Dkt. 121-8. |
| 2022.03.17 Declaration of Anna Francesca Foti, Dkt. 116. |
| 2022.03.21 Declaration of Julia Durbeck, Dkt. 117. |
| Defendant Suffolk University Amended Second Supplemental Responses to Plaintiffs' First Set of Interrogatories, 2022.02.25. |
| First Amended Class Action Complaint and Demand for Jury Trial ("Foti Complaint"), 20-11581-WGY, Dkt. 6. |
| Plaintiff Durbeck's Amended Class Action Complaint and Demand for Jury Trial ("Durbeck Complaint"), 20-110985-WGY, Dkt. 20. |
| Plaintiffs' Memorandum of Law in Support of Class Certification, Dkt. 113. |
| Statement of Undisputed Material Facts in Support of Defendant Suffolk University's Motion for Summary Judgement, Dkt. 121. |

| II. Documents Received from Counsel |
| --- |
| Academic Transcript of Durbeck, J. |
| Academic Transcript of Foti, A. |
| Average Undergraduate Cumulative GPA.xlsx. |
| Course Evaluations Summary Class Action.xlsx. |
| COVID Scholarship Aid.xlsx. |
| Fall 2018.pdf. |
| Fall 2019 Averages.pdf. |
| Fall 2020.pdf. |
| Fall 2021.pdf. |
| May UG Outcomes 2017-2020 4-14-22.xlsx. |
| Retention and Graduation.docx. |
| Spring 20 on campus section previously offered online.xlsx. |
| Spring 2019.pdf. |
| Spring 2020.pdf. |
| Spring 2020 Institutional Scholarships.xlsx. |
| Spring 2021.pdf. |
| 02-05-2021 Spring Enrollment Report.pdf. |
| Suffolk Additional IT Costs.xlsx. |
| Suffolk Enrollment - At Least 1 Online Course.xlsx. |
| Suffolk Student Aid 2020.xlsx. |
| 18-19 Suffolk University - Financial Statements 6-30-2019.pdf. |
| 19-20 Suffolk University - Financial Statements 2020.06.30.pdf. |
| SUFFOLK_00113445. |
| SUFFOLK_00113633 - SUFFOLK_00113634. |
| SUFFOLK_00113670 - SUFFOLK_00113676. |

| III. Texts |
| --- |
| "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012 (Scott-Clayton 2012). |
| Adams, William James and Janet Yellen (1976) "Commodity Bundling and the burden of monopoly" *Quarterly Journal of Economics* , 90: ("Adams and Yellen"). |
| Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." Journal of Political Economy, vol. 81, no. 3, University of Chicago Press, 1973, http://www.jstor.org/stable/1831029. |
| Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013 ("Dynarski"). |

Exhibit 1

**Suffolk University COVID Refund Litigation**
**Documents Considered**

| III. Texts (continued) |
| --- |
| Emanuel, Jeff and Lamb, Anne, "Open, Online, and Blended: Transactional Interactions with MOOC Content by Learners in Three Different Course Formats," working paper, 2015. |
| Epple, Dennis, David N. Figlio and Richard E. Romano (2004). "Competition Between Private and Public Schools: Testing Stratification and Pricing Predictions," Journal of Public Economics, 88(7-8), ("Epple"). |
| Faculty without Students: Resource Allocation in Higher Education.  William R. Johnson and Sara Turner Journal of Economic Perspectives: 23(2), 2009. |
| Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", Academy of Educational Leadership Journal, Vol 15, 2011, ("Newbold"). |
| Ruth, Stephen, Can MOOC's and Existing E-Learning Efficiency Paradigms Help Reduce College Costs? (June 18, 2012). |
| Spence, Michael "Job Market Signaling." Quarterly Journal of Economics. 87(3), 1992. |
| Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011. |
| Varian, Hal R. "Price Discrimination," Working Paper, July 1987. |
| Walsh, James D. "The Coming Disruption," New York Magazine, May 11, 2020. |
| Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch Mission and Money: Understanding the University Cambridge University Press, 2008 ("Weisbrod"). |

| IV. Other Documents Considered |
| --- |
| Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review* , September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on January 17, 2021. |
| https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021. |
| https://nces.ed.gov/collegenavigator/?q=suffolk&s=all&id=168005 viewed on April 14, 2022. |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?unitId=168005&year=2017&surveyNumber=8 viewed on April 19, 2022. |
| https://online.suffolk.edu/landing/boston-online-mba?SearchEngine=GoogleBrand&SearchKeyword=suffolk %20university%20mba&CampaignSourceCode=SU-GoogleBrand-MBA-non-NAT-1535269331&VendorAccountID =44116&MediaCampaignID=1535269331&MediaGroupID=55409464221&MediaAdID=587762714286&Media KeywordID=kwd-339560010430&gclid=EAIaIQobChMIv6Oky5Kh9wIVFRvnCh2o3gjXEAAYASAAEgJU8fD _BwE viewed on April 19, 2022. |
| https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG=, viewed on December 23, 2021. |
| https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022. |
| https://thesuffolkjournal.com/29603/news/suffolk-announces-big-changes-to-how-classes-housing-will-look-in-the-fall/ viewed on April 18, 2022. |
| https://www.investopedia.com/ask/answers/042415/what-are-different-types-price-discrimination-and-how-are-they-used.asp viewed on January 13, 2022. |
| https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on September 28, 2021. |
| https://www.linkedin.com/in/julia-durbeck-063338168/ viewed on April 4, 2022. |
| https://www.mass.gov/news/governor-baker-declares-state-of-emergency-to-support-commonwealths-response-to-coronavirus viewed on April 4, 2022. |
| https://www.pewresearch.org/fact-tank/2021/05/14/college-graduates-in-the-year-of-covid-19-experienced-a-drop-in-employment-labor-force-participation/ viewed on September 22, 2021. |
| https://www.suffolk.edu/-/media/suffolk/documents/student-financial-services/types-of-financial-aid/cares-act/heerfinstshare102620-2_v2.pdf?la=en&hash=C75B0733F137E015C5B344C1C688BF34F2125739 viewed on April 18, 2022. |
| https://www.suffolk.edu/-/media/suffolk/documents/student-financial-services/types-of-financial-aid/cares-act/heerf-reporting-form-1840-0849-20211231.pdf?la=en&hash=2158AE4EF9E94B421631ED4B61D9A96EA9B77F90 viewed on April 29, 2022. |
| https://www.suffolk.edu/about/directory/bursars-office/fall-2020-bursars-faq viewed on April 14, 2022. |
| https://www.suffolk.edu/about/directory/bursars-office/tuition-fees/tuition-rates-2020-21 viewed on April 18, 2022. |
| https://www.suffolk.edu/academics/current-student-resources/academic-calendar/college-of-arts-and-sciences-and-sawyer-business-school viewed on April 14, 2022. |
| https://www.suffolk.edu/student-financial-services/eligibility/enrollment-status viewed on May 4, 2022. |
| https://www.suffolk.edu/student-financial-services/types-of-financial-aid/cares-act-higher-education-emergency-grant-for-students viewed on May 4, 2022. |

**Exhibit 1**

**Suffolk University COVID Refund Litigation**
**Documents Considered**

| IV. Other Documents Considered (continued) |
| --- |
| Pollack, R., Bouchner, S., Enos, C., Johns, C. & Moyl, J. Calculating Lost Profits. *AICPA Business Valuation and Forensic & Litigation Services Section Practice Aid* 06-4 (2013). |
| Restatement (Second) of Contracts, Section 377.  AICPA Lost Profits Guide. |
| www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html viewed June 17, 2021. |



**Alvarez & Marsal**
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

### Benjamin S. Wilner, Ph.D.
Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues.  For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms.  He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics.  Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press.  Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

### Testimony before a Trier of Fact

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020

- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018

- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017

- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017

- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015

- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015

- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015

- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014

- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012

- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011

- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010



- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009
- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009
- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

### Deposition Testimony
- Jennifer Pennington and Josh Pennington v. Memorial Hospital of South Bend, Inc. d/b/a Beacon Health and Fitness, Spear Corporation and Panzica Building Corporation, State of Indiana, St. Joseph Superior Court, April 2022
- Honeywell International Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust, United States Bankruptcy Court, Western District of Pennsylvania, March 2022
- Astria Health v. Cerner Corporation and Cerner Revenue Cycle, LLC., United States Bankruptcy Court, Eastern District of Washington, March 2022
- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021
- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021
- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021
- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021
- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020



- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019

- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019

- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019

- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018

- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018

- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018

- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018

- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017

- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017

- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017

- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016

- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016

- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015



- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014

- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014

- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013

- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013

- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013

- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009

- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011

- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011

- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011

- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010

- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010

- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009

- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009

- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009



- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

## Awards
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

## Professional Memberships
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)

## Publications
- "Sampling is Harder and Cheaper than You Think" *Raising the Bar*, January 2021
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), *Crop Insurance Today*, 44(2), pp. 28 – 32, May 2011



- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) *The SRR Journal*, Spring 2010

- "Statistical Analyses Relation to Reductions In Force," *The SRR Journal*, Spring 2009

- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) *The SRR Journal*, Fall 2007

- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) *The SRR Journal*, Spring 2007 (reprinted on mondaq.com)

- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006

- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," *Journal of Finance*, February 2000

- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," *Credit and Financial Management Review*, Summer 1999

- "Paying Your Bills: The Effect of Corporate Quality" September 1996

- Refereed for the *American Economic Review*, *American Real Estate Society*, *Journal of Finance*, the *Journal of Business, Finance and Accounting*, and John Wiley Publishers



**Suffolk University**                                                                                   **Exhibit 3**
**Tuition & Fee Rates 2019 - 2020**
*Source: SUFFOLK_00113445*

| Programs | Per Semester List Price | Per Credit Hour List Price |
|---|---|---|
| | | **Highlighted if <= $1,171 / credit** |
| **UNDERGRADUATES** | | |
| Undergraduate (Full-time: 12-17 credits per semester) | $ 19,907 | $ 1,171 |
| Paralegal studies (Full time: 12-17 credits per semester) | $ 19,907 | $ 1,171 |
| Madrid (Full-time: 12-17 credits per semester) | $ 15,198 | $ 894 |
| Post Baccalaureate Certificate - Radiation Therapy (Full time: 12-17 credits per semester) | $ 13,243 | $ 779 |
| Post Baccalaureate Certificate - Medical Dosimetry (Full time: 12-17 credits per semester) | $ 13,243 | $ 779 |
| Certified Financial Planner (Per Course) | n/a | $ 1,168 |
| New England School of Art & Design Certificate (Per Credit) | n/a | $ 662 |
| New England School of Art & Design Continuing Education (Per Credit) | n/a | $ 572 |
| **GRADUATES** | | |
| **Graduate College of Arts & Sciences (CAS)** | | |
| MED in Administration of Higher Education (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MA in Communication (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Crime and Justice Studies (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Ethics and Public Policy (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MA in Graphic Design (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Interior Architecture (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Political Science (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Medical Dosimetry (Full-time: 12 credits per semester) | $ 15,288 | $ 1,274 |
| MS in Mental Health Counseling (Full-time: 15 credits per semester) | $ 16,455 | $ 1,097 |
| PhD in Clinical Psychology (Full time: 12 credits per semester) | $ 18,468 | $ 1,539 |
| PhD in Economics (Full time: 9 credits per semester) | $ 13,851 | $ 1,539 |
| Certificate in Disability Services (on-line program) | n/a | $ 750 |
| **Graduate CAS Joint Degree programs** | | |
| Master of Public Administration/MS in Political Science (Per Credit) | n/a | $ 1,217 |
| Master of Public Administration/MS in Crime and Justice Studies (Per Credit) | n/a | $ 1,217 |
| MS in Mental Health Counseling/MS in Crime & Justice Studies (Per Credit) | n/a | $ 1,148 |
| Master in Public Administration /MS in Mental Health Counseling (Per Credit) | n/a | $ 1,122 |
| **Graduate Sawyer Business School (SBS)** | | |
| MBA; MBA/Health; MBA/Non-profit (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Accounting (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Finance (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Financial Services and Banking (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Taxation (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Business Analytics (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| MS in Marketing (Full-time: 12-15 credits per semester) | $ 22,785 | $ 1,519 |
| Master of Health Care Administration (Full-time: 12-15 credits per semester) | $ 17,565 | $ 1,171 |
| Master of Public Administration (Full-time: 12-15 credits per semester) | $ 17,565 | $ 1,171 |
| Executive MBA (per credit) | n/a | $ 1,794 |

CONFIDENTIAL

**Suffolk University**                                                                                  **Exhibit 3**
**Tuition & Fee Rates 2019 - 2020**
*Source: SUFFOLK_00113445*

| Programs | Per Semester List Price | Per Credit Hour List Price |
|---|---|---|
| | | **Highlighted if <= $1,171 / credit** |
| **Certificate Programs** - charged per credit | | |
| Graduate Certificate in Accounting | n/a | $ 1,519 |
| Graduate Certificate in Taxation | n/a | $ 1,519 |
| Graduate Certificate in Finance *(non-business majors or general finance interest)* | n/a | $ 1,519 |
| Graduate Certificate in Corporate Finance *(for previous business majors)* | n/a | $ 1,519 |
| Graduate Certificate in Investments *(for previous business majors)* | n/a | $ 1,519 |
| Graduate Certificate in Financial Services & Banking *(for previous business majors)* | n/a | $ 1,519 |
| Graduate Certificate in Risk Management *(for previous business majors)* | n/a | $ 1,519 |
| Graduate Certificate in Business Fundamentals | n/a | $ 1,519 |
| Graduate Certificate in Business Analytics | n/a | $ 1,519 |
| Graduate Certificate in Marketing | n/a | $ 1,519 |
| Graduate Certificate in Marketing Research | n/a | $ 1,519 |
| Graduate Certificate in Leading Teams & Projects | n/a | $ 1,519 |
| Graduate Certificate in Managerial Skills | n/a | $ 1,519 |
| Graduate Certificate in Managing Talent | n/a | $ 1,519 |
| Graduate Certificate in Advanced Professional | n/a | $ 1,519 |
| Graduate Certificate in Public Administration | n/a | $ 1,171 |
| Graduate Certificate in Healthcare Management & Leadership | n/a | $ 1,171 |
| Graduate Certificate in Healthcare Management: Performance Improvement & Data Analytics | n/a | $ 1,171 |
| Graduate Certificate in State & Local Government | n/a | $ 1,171 |
| Graduate Certificate in Nonprofit Management | n/a | $ 1,171 |
| **Graduate Joint Degree programs** (Full-time: 12-15 credits per semester) | | |
| MBA/MS in Accounting | $ 22,785 | $ 1,519 |
| MBA/MS in Taxation | $ 22,785 | $ 1,519 |
| MBA/MS in Finance | $ 22,785 | $ 1,519 |
| MBA/MS in Business Analytics | $ 22,785 | $ 1,519 |
| MBA/MS in Marketing | $ 22,785 | $ 1,519 |
| MS in Accounting/MS in Taxation | $ 22,785 | $ 1,519 |
| MS in Accounting/MS in Finance | $ 22,785 | $ 1,519 |
| MS in Accounting/MS in Business Analytics | $ 22,785 | $ 1,519 |
| MS in Business Analytics/MS in Finance | $ 22,785 | $ 1,519 |
| MS in Business Analytics/MS in Marketing | $ 22,785 | $ 1,519 |
| **Key Path Online** | | |
| All Keypath Masters Program | n/a | $ 1,171 |
| **LAW** | | |
| Law - Day (Full-time: 10-15 credits per semester) | $ 24,705 | $ 1,647 |
| Law - Evening (Full-time: 7-12 credits per semester) | $ 18,529 | $ 1,544 |
| LLM (Per Credit) | n/a | $ 2,087 |
| LSJD (PHD) (Per Credit) | | $ 2,087 |
| Law Day Accelerated (Full-time 10-15 credits including Summer Term | $ 24,705 | n/a |
| Law Evening Accelerated (Full-time 7-12 credits including Summer Term | $ 18,529 | n/a |
| **Joint Degree - day program** | | |
| JD/MBA (Per Credit) | n/a | $ 1,875 |
| JD/MS in Finance (Per Credit) | n/a | $ 1,768 |
| JD/MS in Criminal Justice (Per Credit) | n/a | $ 1,720 |
| JD/Master of Public Administration (Per Credit) | n/a | $ 1,667 |

**Suffolk University**                                                                                  **Exhibit 3**
**Tuition & Fee Rates 2019 - 2020**
*Source: SUFFOLK_00113445*

| Programs | Per Semester List Price | Higlighted if <= $1,171 / credit |
|---|---|---|
| | | Per Credit Hour List Price |
| **Joint Degree - evening program** | | |
| JD/MBA (Per Credit) | n/a | $ 1,875 |
| JD/MS in Finance (Per Credit) | n/a | $ 1,768 |
| JD/MS in Criminal Justice (Per Credit) | n/a | $ 1,720 |
| JD/Master of Public Administration (Per Credit) | n/a | $ 1,667 |