UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  SUFFOLK UNIVERSITY COVID REFUND LITIGATION | Master File No.: 1:20-cv-10985-WGY |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' REPLY MEMORANDUM
<u>IN SUPPORT OF CLASS CERTIFICATION</u>**

**INTRODUCTION**

Defendant Suffolk University ("Suffolk" or "Defendant") is asking this Court to do what a majority of courts that have ruled on class certification in COVID refund cases against colleges and universities have not done: deny Plaintiffs' Motion for Class Certification,[1]  Suffolk does not challenge class certification with respect to contract formation or the claim that Suffolk provided a substitute product (remote instruction and services) that was different from what students paid for and expected (the on-campus experience); Suffolk's challenge to class certification is based on injury and damages.

Suffolk's challenge to Plaintiffs' method for calculating damages runs counter to the damage formula courts have accepted in certifying classes in other similar cases, including the other COVID tuition refund decisions cited herein.  Plaintiffs have provided a more than sufficient damages methodology based on determining the difference between the market value of the remote instruction they received and the market value of the in person, on campus education that they paid for and bargained for, pro-rated for the portion of the Spring 2020 semester during which remote-only instruction was provided.  Defendant relies on the fact that it charges the same price per credit for online undergraduate courses as for classes in its in-person undergraduate program.  This does not preclude injury or damages, as Suffolk contends, because, among other reasons, this is not an appropriate comparison and the price charged by Suffolk for its online courses the price charged is not necessarily determinative of the market value of those courses. In addition, the remote instruction provided by Suffolk is not the same product as its planned and structured online courses.

---

[1] *See* Plaintiffs' Memorandum in Support of Motion for Class Certification ("Pl. Mem.) [ECF No. 113] at 2.

Suffolk resorts to a myriad of purported individual issues (most, if not all of which are irrelevant); a baseless challenge to Plaintiffs' standing and to the ascertainability of the Class based on who funded the students' tuition; a claim that the students accepted the value of the remote instruction and services as equal to the value of the in-person experience they paid for by enrolling and paying tuition for the Fall 2020 semester; and other, similar arguments, none of which have any merit, as discussed herein.  Suffolk also challenges the certification of Plaintiffs' unjust enrichment claim, which clearly does not involve any individual issues and should be certified.

Throughout its argument, Suffolk also ignores the fact that what Suffolk students bargained for by paying full tuition and fees was not just the in-person classroom experience, but it also involved a broader on-campus experience touted and marketed by Suffolk, involving a broad array of services.

## ARGUMENT

I.    **SUFFOLK'S ASSERTION ABOUT TUITION PAYMENT DOES NOT DEPRIVE DEPRIVE PLAINTIFFS OF STANDING AND DOES NOT PRECLUDE IDENTIFICATION OF THE CLASS**

Suffolk says that Plaintiffs Anna Foti ("Foti") and Julia Durbeck ("Durbeck") do not have standing to sue because they either didn't pay their own tuition or did not provide evidence that they did,[2] and that the class is not ascertainable because there is no way to determine which students paid their own tuition (as opposed to parents, other family members, or other third parties)[3]  Both arguments are wrong because it is irrelevant how or by whom the student's tuition payment was funded.  Every Suffolk student signs an Acknowledgment of Debt Terms and

_____

[2] Defendant Suffolk University's Opposition to Plaintiffs' Moton for Class Certification ("Def. Mem.") [ECF No. 33] at 6.
[3] Def. Mem. at 6-7.

Conditions (Acknowledgment"),[4] assuming responsibility for payment of tuition and fees, assuming liability for failure to pay such amounts when due, including litigation costs, acknowledging that delinquencies may affect the student's credit rating, and authorizing Suffolk to contact the student regarding any outstanding debt. Thus, it is the **student** who is obligated to pay the tuition and fees, it is the **student** who is held responsible in the event of non-payment and who suffers the consequences of any such default and resulting collection efforts, and it is the **student** who ultimately pays these amounts (whether by money from parents, loans, or otherwise).[5]  If Anna Foti's mother gives her money to buy a car, would Suffolk contend that Anna can't sue the car dealer (or pursue other remedies) under the Lemon Law if the car turns out to be defective?

The Court in *Little v. Grand Canyon Univ*. 2022 WL 266726 at *3 (D. Ariz. Jan. 28, 2022), quickly and easily disposed of Suffolk's argument on these points:

> GCU's argument that Plaintiff lacks standing because his parents paid his fees and costs must be rejected. While Plaintiff's parents paid his fees and costs, he is ultimately the individual who had a contract with GCU. In other words, if he had failed to pay, he—not his parents—would be on the hook. It does not matter how he procured the money to pay his obligations to GCU, it was ultimately his obligation . . . It is irrelevant if Plaintiff got the money from his parents, a student loan, or a scholarship.[6]

Without an inquiry into the source of funds, the Class is easily ascertainable.  It is beyond dispute that Suffolk has records identifying all students and the amounts they paid in tuition and

---

[4] *See* Statement of Undisputed Material Facts in Support of Defendant Suffolk University's Motion for Summary Judgment ("SOF") [ECF No. 121], ¶ 23; Affidavit of Sujata T. Puthussery in Support of Defendant Suffolk University's Motion for Summary Judgment ("Puthussery Aff.") [ECF No. 121-8], ¶¶ 3-4, Exhibit A.

[5] Suffolk admits that Foti paid tuition.  "Plaintiff Anna Foti enrolled in and **paid full tuition** [for] Suffolk's undergraduate degree program in Fall 2020. SOF, ¶58.  Suffolk also admits that both plaintiffs paid Spring 2020 tuition "[a]fter signing the Acknowledgment."  *Id.*, ¶ 27.

[6] *See also Salerno v. Florida Southern College*, 488 F. Supp. 3d 1211, 1216 (M.D. Fla. 2020) (where student and her mother filed suit against college and where mother alleged that she paid the tuition, student had standing to sue but mother did not); *Duke v. Ohio Univ.*, Case No. 2021-0036JD (Ohio Ct. Cl. Feb. 5, 2022) (finding plaintiff had standing even though mother alleged she paid the tuition and rejecting same argument as challenge to ascertainability), Supplemental Declaration of David Pastor in Support of Plaintiffs' Motion for Class Certification ("Pastor Decl."), **Exhibit A**.

4

fees (and the types of fees paid).  There is, therefore, an administratively feasible mechanism for identifying Class members here.[7]

## II.      PLAINTIFFS' TUITION CONTRACT CLAIMS SATISFY PREDOMINANCE

### A.      Plaintiffs Propose a Suitable Model for Calculating Classwide Damages

Plaintiffs propose to measure damages based on the difference in value between what the Class members paid for (in-person education and other services measured by the tuition and fees they paid) and the remote instruction provided by Suffolk, and that this difference in value would be prorated for the portion of the Spring 2020 semester during which remote-only instruction was provided.  Not only have Plaintiffs proposed a method for calculating classwide damages, but they have also provided an estimate of those damages.

Suffolk contends that Plaintiffs cannot present a viable damages model and cannot show that any Class member was injured because, Suffolk asserts, Plaintiffs rely on the prices charged for online courses and programs, and Suffolk's prices for online courses are the same as for classes in its in-person undergraduate program.[8]  That Suffolk charges the same price per credit for individual online **courses** as it charges for classes in its in-person undergraduate **programs** does not negate injury or damages for Plaintiffs or for other members of the Class, and it does not defeat predominance.[9]  First, as Suffolk acknowledges, it does not have any undergraduate

---

[7] To the extent that *Evans v. Brigham Young Univ.*, 2022 WL 596862 (D. Utah Feb. 28, 2022), relied upon by Suffolk (Def. Mem. at 7), supports a result contrary to *Little* and *Salerno* on the source of funds issue, it is simply an incorrect application of the law.  *Evans* is also distinguishable because the class was defined as "all persons who paid tuition and/or fees," in contrast to the student class proposed here.  See Evans at *2, *4.

[8] Def. Mem. at 8.
[9] In *Cross v. Univ. of Toledo*, 2021 WL 1822676 (Ohio Ct. Cl. Apr. 26, 2021), the Court the court found predominance satisfied as to common classwide injury and certified the class, despite "the evidence show[ing] that UT students pay the same tuition for in-person and online classes"). They actually paid more for online classes because there was a $25 fee for each online class.  *Id*. at *4, *5.

online programs,[10]  and as Suffolk also acknowledges, comparing the price of a single online course to the per credit price of a class in an in-person program is not an appropriate comparison.[11]  Second, while Suffolk may charge undergraduates the same per credit price for an online course as it does for an in-person class, the price Suffolk charges for online courses does not necessarily reflect the market value of such courses, and Plaintiffs do not concede that it does.[12]

Finally, the remote instruction provided by Suffolk (and other institutions) as a result of COVID-19 is a separate product, distinct from (and having a lesser objective value than) either planned and structured online courses or in-person classes.  The remote instruction provided by Suffolk during Spring 2020 was not the equivalent of Suffolk's planned, well-established online offerings.  These hurriedly arranged and implemented remote offerings have been referred to by education experts as emergency remote teaching, or ERT.  The inherent difference between established online learning programs and courses (such as Suffolk's) and ERT has been recognized by experts in the field and has been a subject of industry study and discourse.[13]

---

[10] SOF, ¶ 43.

[11] See Defendant Suffolk University's Memorandum of Law in Support of its Motion for Summary Judgment ("Suffolk SJ Mem.")[ECF No. 120] at 12 ("Suffolk does not offer an online undergraduate degree program, making the pricing of its [individual] online courses an apples-to-oranges comparison").

[12] It is entirely possible that Suffolk prices its online courses the same as its class in its in-person program for reasons having nothing to do with market value.  One possible reason would be convenience; since most, if not all undergraduates who take one or more online courses also take in-person courses in the same semester, if there was a price differential, Suffolk would have to separately determine the tuition for each undergraduate with a mix of online and in-person classes (an administrative nightmare) instead of a uniform tuition for all full time undergraduates, as it has now.

[13] See Hodges, Moore, Lockee, Trust, and Bond, "the Difference Between Emergency Remote Teaching and Online Learning," Educause Review, March 27, 2020, submitted herewith as Pastor Decl., **Exhibit B,** and available at https://er.educause.edu/articles/2020/3/the-difference-between-emergency-remote-teaching-and-online-learning:

> Well-planned online learning experiences are meaningfully different from courses offered online in response to a crisis or disaster.  Colleges and universities working to maintain instruction during the COVID-19 pandemic should understand those differences when evaluating this emergency remote Teaching.
>
> Typical planning, preparation, and development time for a fully online university course is six to nine

Suffolk, relying on the report of its expert, Benjamin S. Wilner, Ph,D ("Wilner Report"), refers to a host of irrelevant and non-dispositive data that supposedly show an absence of classwide injury or damage and that present individual issues precluding predominance.[14]  In particular, Suffolk, citing the Wilner Report,[15] asserts that instructor ratings, graduation rates, students' GPAs and graduates' earnings did not decline as a result of the switch to remote instruction and that, therefore, neither Plaintiffs nor any Class member suffered any injury from the switch.  None of these items are indicative of a lack of injury or damages, much less are they dispositive of the issue.  There are obviously many possible reasons for instructor ratings, graduation rates, student GPAs and graduate earnings, including reasons that have nothing to do with the value of the remote instruction provided.[16] In any event, none of these factors conclusively show lack of injury or damages.  For example, any absence of a decline in instructor ratings during Spring 2020 is not relevant to the inquiry.  Plaintiffs do not allege any deficiency in the performance of Suffolk's faculty members during the period of remote instruction.[17]

---

months before the course is delivered.

In contrast to experiences that are planned from the beginning and designed to be online, emergency Remote teaching (ERT) is a temporary shift of instructional delivery to an alternate delivery mode due to crisis circumstances.

*See also* Lauren Glen Manfuso, "From Emergency Remote Teaching to Rigorous Online Learning," EdTech—Focus on Higher Learning (May 7, 2020), available at The Differences Between Online Learning vs. Emergency Remote Teaching | EdTech Magazine

[14] Def. Mem. at 9.
[15] Wilner Report at 16-20.
[16] In an absurd attempt to demonstrate the presence of individual issues, the Wilner Report resorts to comparing the two Plaintiffs' GPAs for Spring 2020, stating that "[t]his demonstrates the different and individualized academic experiences that occurred in Spring 2020.  Wilner Report at 18, n. 82. Such a conclusion is completely unsupported.
[17] Moreover, the charts in the Wilner Report regarding instructor ratings and related factors do not show what they purport to show.  Figures 1, 2, and 3 in the Wilner Report (at p. 17), with the exception of Suffolk Law School, do not show any data for previous semesters, leaving open the question of whether there was a decline during Spring 2020.

What this entire argument ignores is that what Plaintiffs and Class members paid for and were promised included classroom instruction, but it was broader than that; it included access to an array of educational and related services at Suffolk, all of which were centered around the university's campus.  The campus, its location in and access to the amenities of Boston, and experiential learning were all part of the package offered and sold to every Class member.  The services that Plaintiffs and Class members bargained for would include, in addition to classroom instruction, library resources, career services, health services, campus dining services and other facilities and services too numerous to list here.  In the middle of the Spring 2020 semester, that experience and the related services were removed and replaced by access to a much narrower set of services and a significantly altered experience centered on a monitor and a keyboard.

Finally, Suffolk's criticism about the appropriateness of using Suffolk's online graduate programs or online programs at other institutions as comparators for a market value evaluation[18] is misguided.  Market value assessments often involve comparisons with competing products offered by other companies or other products offered by the same company, as is frequently the case in litigation based on false advertising claims.[19]

### B.    No Educational Malpractice Assessments Would be Involved

What was true when the motion to dismiss was decided remains true now.  Quality of education (or lack thereof) is not the subject of Plaintiffs' claims and is not at issue here. Plaintiffs.  It is a determination of objective market value, whether Suffolk's online programs, or

---

[18] Def. Mem. at 9-10.
[19] In addition, the Suffolk MBA program is not the only graduate program with a price difference for online vs. in-person.  Suffolk's current graduate tuition schedule for the Sawyer Business School shows a per credit rate for "[a]ll Online Master Programs" of $1,243, while the per credit rate for the in-person programs ranges from $1,262 to $1,953. The same is true for graduate certificate programs, for which the online per credit rate is $1231, and the in-person per credit rates range from $1,262 to $1,638.  https://www.suffolk.edu/about/directory/student-account-services/tuition-fees/graduate.

programs at other institutions are used as a benchmark for the value of the emergency remote teaching provided by Suffolk.

Suffolk is also wrong that an analysis of the market value of the remote instruction it provided would interfere with the discretion of its administrators under the First Amendment.[20] Simply put, there was no academic discretion, and actually no discretion at all involved in Suffolk's decision to suspend in-person classes and to close its campus.  These actions by Suffolk, as it clearly states, were in response to the COVID-19 pandemic and more specifically, in response to the executive orders issued by Massachusetts Governor Charlie Baker.  *See* SOF, ¶¶ 1-9.

###    C.    Students' Enrollment for Fall 2020 and Their Payment of Full Tuition is not an Expression of the Value of Remote Instruction

Suffolk contends that "the overwhelming majority of" Class members, including Plaintiff Foti, chose to enroll and pay full tuition for the Fall 2020 semester when it was known that "in-person education and on-campus activities were imperiled if not non-existent," and that this means that the students valued the ERT provided by Suffolk equally to the in-person, on-campus experience.[21]  This argument is based on a false or at least misleading premise. First, the statement that Suffolk relies upon for the students' supposed knowledge of continuing remote instruction for Fall 2020[22] did not inform the students that all classes would be conducted by remote instruction.  That announcement, in the Fall 2020 Campus Reopening Student Guide for Undergraduate and Graduate Students of the College of Arts & Sciences and the Sawyer

---

[20] Def. Mem. at 12.
[21] Def. Mem. at 13-14 (quoted language at 13).
[22] Suffolk does not cite any source for this purported knowledge, but it is apparently basing its assertion on the statement cited in SOF, ¶ 54.

Business School ("Reopening Guide"),[23] was equivocal at best and did not appear to apply to all classes: "**any class may** need to shift to being delivered entirely online as a result of a change in circumstances[.]"[24]  Not only is the statement inconclusive, but the students had less than a week after receiving that statement to decide whether to pay their Fall 2020 tuition.  In the introductory letter from Anne Coyne and on every page of the Reopening Guide, the following caveat appears: "information provided is accurate as of July 27, 2020," and Fall 2020 tuition payments were due five days later, on August 1, 2020.[25]  So Suffolk's statement that the students accepted the bargain offered by Suffolk "with eyes wide open" is false.  In that short period of time, what exactly did Suffolk expect Ms. Foti and the other continuing students to do?  Not enroll for that semester and suspend or terminate their college education?  Transfer to another college or university that presumably was also providing ERT?

The weight of authority is against Defendant's acceptance argument.  In *Gibson v. Lynn Univ.*, 1504 F. Supp. 3d 1335, 1343 (S.D. Fla. 2020), the defendant made a similar argument, asserting that the plaintiff's breach of contract claim was barred because he "ratified the allegedly breaching conduct by continuing to attend courses remotely and accepting credits." The Court rejected that argument, concluding that the plaintiff did not "relinquish[] his contractual remedies" by failing to "quit school mid-semester and risk forfeiting his tuition."  *Id.* The same conclusion was reached in *Rosado v. Barry Univ.*, 499 F. Supp. 3d 1152, 1159 (S.D. Fla. 2020) (finding that the university "has not provided sufficient support for its position that Rosado was required to threaten Barry, risk financial loss, and disrupt her academic career in

---

[23] https://www.suffolk.edu/-/media/suffolk/documents/student-life/health-and-wellness/coronavirus-health-advisory/campus-reopening-2020/info-for-students-and-families/u060320-campus-reopening-student-guide-v4_8_148669.pdf?la=en&hash=8B456718FD68D07A2EFF240BA0C70FFB4243E256.
[24] Reopening Guide at 13 (emphasis added).
[25] Reopening Guide at 26.

order to preserve her contractual remedies").[26] *Spiegel v. The Trustees of Indiana Univ.*, 2020 WL 7135320 at *3 ((Ind, Cir. Ct. Nov. 19, 2020)   Given the ambiguous information provided to the Suffolk students and the extremely short window they had to pay their Fall 2020 tuition after receiving that information, Ms. Foti and the other Class members were not in a materially different position than the plaintiffs in *Gibson* and *Rosado*.

Suffolk also speculates that the "relatively few students who did not re-enroll" did so for a number of reasons, and that "those reasons vary and require individual fact determinations."[27] This is a ludicrous argument for several reasons.  First, to repeat, re-enrollment under the circumstances does not constitute a statement of acceptance or value, and, accordingly, what happened or didn't happen during the Fall 2020 semester is irrelevant.  Second, the actions or decisions of a small minority of students and their reasons for doing what they did is even less relevant.  Finally, as Suffolk itself states, the "overwhelming majority" of students not graduating in Spring 2020 re-enrolled for the Fall 2020 semester, so whatever meaning is to be derived from the act of re-enrolling will be the same for virtually the entire Class; accordingly, no individual issues.

    **D.**    **Suffolk's Purported "Individualized Issues" are Irrelevant**

Suffolk, relying on the Wilner Report, asserts the presence of "individualized issues" that purportedly defeat predominance, such as the small percentage of students who signed up for online course, the differing circumstances under which students received financial aid, and purported differences in the impact of the transition to remote instruction on individual

---

[26] *See also Spiegel v. The Trustees of Indiana Univ.*, 2020 WL 7135320 at *3 ((Ind, Cir. Ct. Nov. 19, 2020), *aff'd*, --- N.E. 3d---, 2022 WL 964474 (Ind. Ct. App. March 31, 2022) ("Defendant has not provided sufficient support for its position that Plaintiff was required to risk financial loss and disrupt his academic career in order to preserve his contractual remedies").

[27] "Def. Mem. at 13.

students.[28]  These issues are irrelevant and have no impact, except for a possible effect on individual damage amounts, which would not preclude a finding of predominance.

The fact that a small percentage (9%) of Suffolk students took one online course before the switch to remote instruction is irrelevant and does not indicate lack of injury for those students nor does it defeat predominance. First, the option of taking one or possibly two online courses is a very small part of the educational and other related services marketed by Suffolk. As Suffolk acknowledges, an overwhelming majority of students (91%) never chose that option. Second, as discussed in detail above in Section II.A., a fully planned and structured online class or curriculum, putting aside all of the other products and services included in the full campus access bargained for by Class members, is an inherently different product than the emergency remote teaching that was given to Class members in Spring 2020.  In addition to the fact that this inherent difference is recognized by education experts (as discussed above), it is also logically obvious, given, among other factors, the amount of planning and preparation that goes into a traditional online course.  Third, though attendance at in person classes is clearly a major part of the campus access package that the students paid for and were promised, there were clearly other services and products that were unavailable when the campus was closed during Spring 2020 (but were available to students in previous semesters whether or not they chose to take an online course.  Even if we presume that the students who chose to take an online class did not suffer an injury from the switch to remote instruction and the closing of campus, this small percentage would be a *de minimus* number and would not preclude a finding of predominance.  *See In re Nexium Antitrust Litig.*, 777 F. 3d 9, 14 (1st Cir. 2015).

Contrary to Suffolk's argument, the financial aid received by Plaintiffs and other Class members is also irrelevant.  The receipt of financial aid does not demonstrate a lack of harm or

---

[28] Def. Mem. at 14-16.

injury, nor does it create individual issues among Class members.  In an objective market value comparison (the objective market value of the in-person instruction students paid for vs. the objective market value of the emergency remote teaching they received), the amounts of financial aid received by individual students have no relevance.[29]  The objective value of the in-person instruction that the students paid for, for the purposes of assessing classwide damages, is measured by the tuition they paid, and the tuition was the same for all students in a particular program-for example, all undergraduates paid $19,907 in tuition for the Spring 2020 semester.  See SOF, ¶¶ 27, 39.  Plaintiffs and Class members **paid** that tuition, though the tuition payments may have come from different sources for different students (direct payments, applied credits, financial aid and/or loans).[30]  *See Little*, 2022 WL 266726 at *3 (where the plaintiff paid tuition, "it is irrelevant if Plaintiff got the money from his parents, a student loan, or a scholarship").   In *Arredondo*, the Court dismissed a similar argument based on receipt of financial aid:

> Defendant cites Arredondo's scholarships as a reason her claims are not typical of the class. . . While Defendant is correct that the damages calculation for Arredondo may vary from other class members', this would only change the result of the calculation, not the method.  A differing amount of damages does not change the fact that Arredondo's claims are reasonably co-extensive with those of her fellow class members.

*Id.*, 2022 WL 1183561 at *3 (internal quotation marks and citation omitted.[31]   It is axiomatic that individual damage issues do not preclude predominance.  *Smilow v. Southwestern Bell Mobile Systems, Inc*., 323 F. 3d 32, 40 (1st Cir. 2003); *Baker v. Equity Residential Mgmt., LLC*, 390 F. Supp. 3d 246, 260 (D. Mass. 2019).  For similar reasons as stated with respect to financial

---

[29] Suffolk conceded this point, noting that "financial aid has nothing to do with objective market value."  Def. Mem. at 15.

[30] Suffolk acknowledges this, stating that "[e]ach Plaintiff paid $19,907 in tuition for the Spring 2020 semester." Defendant Suffolk University's Memorandum of Law in Support of its Motion for Summary Judgment [ECF No. 120] at 2.

[31] Similarly, in *Weiman v. Miami Univ*., Case No. 2020-00614JD (Ohio Ct. Cl. Dec. 13, 2021), Pastor Decl., **Exhibit C**, the defendant argued that the proposed class of all tuition-paying students was overbroad because it would include students who chose to enroll in online courses and students who received financial aid.  The Court found the predominance element to be satisfied and certified the proposed class, implicitly rejecting these arguments. *See id*. at 3, 9, 12.

aid, the receipt by Class members of CARES Act funds does not negate injury or present an individual issue that would preclude predominance.  At most, this would present an individual damage issue for students who received such funds.

The other purported individual issues cited by Suffolk are even less relevant than the issues discussed above and need not be accounted for in any damage analysis.  Suffolk points to the potential differing effects of the switch to emergency remote teaching on individual students, depending on the courses they were taking and whether they were in large lectures or small labs prior to the switch, and factors such as variability in professor satisfaction, course ratings, and student GPAs.[32]  These minute and irrelevant distinctions are emblematic of a "kitchen sink" approach, with Suffolk attempting to come up with any distinction that might distinguish one Class member from another, whether or not it has anything to do with liability or damage issues in this case.

## II.    PLAINTIFFS' FEE CONTRACT CLAIMS SATISFY PREDOMINANCE

### A.    The Class is Ascertainable for Plaintiffs' Fee Claims

Defendant argues that Plaintiffs' class definition is not ascertainable for their fee claims because Plaintiffs do not specify in their class definition which fees should be considered.[33] The proposed Class here is easily ascertainable: identification is shown by Suffolk's student Account Statements, which all fees and all of the other charge and payment transactions associated with each student.[34] Therefore, because Defendant maintains records of all student payments, it would be easy to ascertain which students paid fees, which fees were paid, and in what amount. *See*

---

[32] Def. Mem. at 16.
[33] Def. Mem. at 16.
[34] Affidavit of Anna Francesca Foti, Exhibit 1[ECF No. 129-1]; Affidavit of Julia Durbeck, Exhibit 1 [ECF No. 130-1].

*Little*, 2022 WL 266726 at *5 (the University could readily ascertain the identity of class members from its records, which should show the amount of fees that each student paid).

While Plaintiffs believe that the fee portion of the class as defined is ascertainable, Plaintiffs propose to revise the definition so that the fees would be limited to Mandatory Fees (activity fees and technology fees) and lab fees.

### B.  Plaintiffs Propose a Suitable Model for Classwide Damages on Fees

Defendant incorrectly contends that Plaintiffs cannot establish class-wide damages for fees.  Given that: the campus was closed and that there was no access to campus facilities, including libraries, computer labs, bookstore, and printing facilities;[35] Suffolk-sponsored meetings and events were either severely restricted or cancelled;[36] and laboratory facilities were not available,[37] the damages for the fees would be the amount of the activity fees, technology fees, and lab fees paid by Plaintiffs and Class members, less the value of any services provided prorated for the period that the campus was closed.  Alternatively, the damages could be measured by the difference between the amount of the activity fees, technology fees and lab fees paid by Class members and the value of any services provided by Suffolk in the areas covered by these fees.

Suffolk's that the amount of some fees varied by program is of no consequence, as classes routinely get certified where the damage amount is individualized.[38]  In addition, as stated repeatedly in this litigation, Plaintiffs have alleged that Suffolk's promise was for **in-**

---

[35] See Exhibit A to Affidavit of Ann Coyne in Support of Defendant Suffolk University's Motion for Summary Judgment [ECF No, 121-1] at SUFFOLK_00113626, 00113629, 00113630.

[36] Exhibit A to Affidavit of David Pastor in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgement [ECF No. 128-1].

[37] Affidavit of Julia Durbeck [ECF No. 130,] ¶ 11.

[38] *See Alexander v. Florida Int'l Univ. Bd. of Trustees*, Case No. 2021-009869-CA-01 (44) (Fla. Cir.Ct.,11th Jud.Cir. Dec. 30, 2021) ("even though the damages owed to class members may vary based on the particular fee charged, damages can be easily calculated utilizing class-wide data available from [the university]" (internal quotation marks omitted). Pastor Decl., **Exhibit D**.

**person** and **on-campus** services. So the fact that Suffolk provided **some** of these services **remotely** does not fulfill this alleged promise.

### C.      Suffolk's "Individualized Issues" with Respect to Fees are Irrelevant

The purported individualized issues raised by Suffolk with respect to mandatory fees are irrelevant and do not need to be taken into account when calculating class-wide damages.   In making this argument, Suffolk erroneously treats the fees like use fees, instead of access fees (which is what they are), also contends that different students might place different values on a particular fee.   Suffolk's usage argument was addressed and rejected in *Little*:

> the Court also rejects GCU's argument that Plaintiff lacks standing because he did not use all the services or facilities for which he paid. Regardless of whether Plaintiff used the facilities, GCU breached the contract between the parties if GCU failed to offer the facilities or services due to the COVID-19-related closures on campus. Plaintiff is correct that he is entitled to have what he paid for regardless of whether he chose to use those services.

In addition, the subjective values placed on particular fees by individual students is irrelevant and of no consequence; because Suffolk requires each student to pay these mandatory fees regardless of the subjective value the students place on the services rendered in exchange for the fee.  If Suffolk's argument had any merit, the students would only be assessed, and would pay for the dollar amount equal to their subjective value of each fee and service.

Suffolk's assertion that the prices (for tuition and fees) cannot be apportioned equally across the number of days in a semester suggests at most trivial and irrelevant differences which need not be taken into account.  Suffolk (and Dr. Wilner) based this assertion on Dr. Wilner's discussion of unit pricing with bundled as compared to individually sold products.[39]  This analysis simply is not an appropriate analogue for Suffolk's tuition and fees. Prorating fees and costs that are paid in advance (as with Suffolk's tuition and fees) is common when calculating refunds or adjustments, such as with a cancelled

---

[39] *See* Wilner Report at 23-24.  Dr. Wilner provides the example where a six-pack of soda might sell for $3.00 while an individual can might sell for $1.00, instead of the proportional $.50, but that a customer could not complaint if the grocery store overcharged him for the single can.

insurance policy or real property rentals, where essential services may have been interrupted for a few days or less.

The common issue that predominates over any individualized question is whether Suffolk breached the contract with students who paid fees by failing to provide them with in-person and on-campus access to facilities and services for the entire Spring 2020 semester.  Thus, Plaintiffs have satisfied the predominance requirement.

## III.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM CAN BE CERTIFIED

Plaintiffs have clearly not waived consideration of certification for their unjust enrichment claim.  Neither *Bolin v. Sears, Roebuck & Co*., 231 F. 3d 970 (5th Cir. 2000), nor *Stevens v. Harper*, 213 F.R.D. 358 (E.D. Cal. 2002), support such a result.  Plaintiffs, in their opening memorandum, argued for certification of all of the claims asserted in the Complaints and quoted from a decision in which the court specifically references that the predominance requirement was met by the plaintiff's unjust enrichment claim.  See Plaintiffs' Memorandum in Support of Motion for Class Certification ("Pl. Mem.") [ECF No. 113] at 15, quoting *Alexander* at 12.  In the unjust enrichment claim, Plaintiffs seek the difference in value between what they paid for an in-person education and campus experience and the remote instruction and services that they received, as acknowledged by Suffolk.[40]  This does not involve any individualized assessments, because the tuition and fees that Class members paid were standard and uniform for undergraduates[41] and within each graduate program (except for course specific fees, which were uniform for students taking each applicable course).  On the other side of the equation, the value of the performance rendered by Suffolk, no individual assessments need be made, as all Suffolk students were provided with the same remote instruction. Additionally, Suffolk's primary

---

[40] Def. Mem. at 19.
[41] SOF, ¶ 39.

defense to the unjust enrichment claim appears to be that it did not benefit financially from the transition to remote instruction and other services and that it lost "significant revenue" for Spring 2020 and other semesters.  To the extent that it is relevant to the unjust enrichment claim, any inquiry into the financial impact on Suffolk from the transition to remote instruction and services will by definition not involve any individual issues.  Courts in similar COVID refund cases have certified unjust enrichment claims.  *E.g.*, *Alexander*, *supra*; *Duke* at 15 ("whether a benefit was conferred upon Defendant by the students and whether retention of the benefit would be unjust can also be determined by external conduct"); *Cross, supra* (certifying class on claims for breach of contract and unjust enrichment).  *See id.*at *1.

Accordingly, the unjust enrichment claim should be certified.

## IV.    THE SUPERIORITY ELEMENT IS SATISFIED

Plaintiffs, in their Motion for Class Certification, have previously demonstrated that no manageability issues would preclude class treatment from being the superior method of adjudication. A key factor in the superiority analysis is manageability, and a "class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *In re McKesson*, 767 F. Supp. 2d at 271. Despite this, Suffolk argues that Plaintiffs have failed to satisfy the superiority requirement because they have not presented a trial plan.  This does not mean that the superiority requirement has not been satisfied.

As the Supreme Court has held, Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery. See *Amchem Prods., Inc.*, 521 U.S. at 617, 117 S.Ct. 2231. This Court has found, where manageability was in contention, that "a class action lawsuit here would

be a better option than multiple individual actions, coordinated individual actions, consolidated individual actions, test cases, or any of the other options of which the Court is aware. The Plaintiffs have established superiority." *George v. Nat'l Water Main Cleaning Co*., 286 F.R.D. 168, 183 (D. Mass. 2012). The same conclusion was reached in *Little*: "it is clear that a class action is the most efficient way to manage this controversy. Otherwise, roughly 20,000 students would need to individually litigate their breach of contract claims against GCU, and students would likely not be able to collect enough in damages in order to bring suit on their own." *Id*. at *7.  The same is true here. Thus, Plaintiffs have satisfied their burden to show class treatment would be superior to other available methods of adjudication.

## **CONCLUSION**

For the reasons stated herein and in Plaintiff's opening memorandum, Plaintiffs' Motion for Class Certification should be granted in all respects.

Dated: April 25, 2022                              Respectfully submitted,


                                                   */s/*  David Pastor
                                                   David Pastor (BBO # 391000)
                                                   **PASTOR LAW OFFICE, LLP**
                                                   63 Atlantic Avenue, 3d Floor
                                                   Boston, MA 02110
                                                   Tel.: (617) 742-9700
                                                   Fax: (617) 742-9701
                                                   Email:  dpastor@pastorlawoffice.com

Richard E. Levine (BBO 672675)
**STANZLER LEVINE, LLC**
65 William Street, Suite 205
Wellesley, MA 02481
Telephone: (617) 482-3198
Email:  rlevine@stanzlerlevine.com

Roy T. Willey, IV (admitted *pro hac vice*)
Eric M. Poulin (admitted *pro hac vice*)
Blake G. Abbott (admitted *pro hac vice*)
**Poulin | Willey | Anastopoulo**
32 Ann Street
Charleston, SC 29403
Telephone: (843) - 614 - 8888
Email: eric@akimlawfirm.com
Email: roy@akimlawfirm.com
Email: blake@akimlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I, David Pastor, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated:   May 23, 2022

_/s/_ David Pastor
David Pastor